## Michael Wayne Williams

### v.

## Commonwealth of Virginia

Record No. 940445

November 4, 1994

Present: Compton, Stephenson, Whiting, Lacy, Hassell, and Keenan, JJ.,
and Harrison, Retired Justice

*R. Donald Ford, Jr. (Lucretia A. Carrico; Hayes & Carrico*, on brief), for appellant.

*Donald R. Curry, Senior Assistant Attorney General (James S. Gilmore, III, Attorney General*, on brief), for appellee.

JUSTICE WHITING delivered the opinion of the Court.

Michael Wayne Williams was tried upon indictments charging him with 12 felonies arising out of the February 27, 1993, murders of Morris C. Keller, Jr., and his wife, Mary Elizabeth Keller, in Cumberland County. Five indictments charged Williams with the capital murders of Mr. and Mrs. Keller, two of which charged their murders in the course of a robbery while armed with a deadly weapon, Code § 18.2-31(4), two of which charged the Kellers' murders subsequent to the rape of Mrs. Keller, Code § 18.2-31(5), and the fifth indictment charged the killing of the Kellers as a part of the same act or transaction, Code § 18.2-31(7). The seven remaining indictments charged Williams with Mrs. Keller's rape, the burglary and arson of Mr. Keller's house, and the robberies and abductions of the Kellers.

In the first stage of a bifurcated trial conducted pursuant to Code §§ 19.2-264.3 and -264.4, a jury convicted Williams of all 12 charges and fixed his punishments on the non-capital convictions. In the second stage of the trial of the capital murder charges, the jury fixed Williams's punishments for the capital murder of Mrs. Keller at death and for the capital murder of Mr. Keller at death, based on its findings of "future dangerousness" and "vileness." The court then referred the matter to the probation officer for an investigation and report pursuant to the provisions of Code § 19.2-264.5. After considering the probation officer's report, the court imposed the jury sentences.

Williams appeals only his capital murder convictions. We have consolidated his appeal with our automatic review of his death sentence under Code § 17-110.1(A).

## I. EVIDENCE

A substantial part of the Commonwealth's evidence comes from the testimony of Jeffrey Alan Cruse, Williams's confederate in these crimes. Pursuant to established principles of appellate review, we will view the evidence and all reasonable inferences arising therefrom in the light most favorable to the Commonwealth, the prevailing party at trial.

Between 9:30 and 10:30 p.m., on Saturday, February 27, 1993, Verena Lozano James drove Williams and Cruse to a rural area in Cumberland County and left them approximately one-half mile from Bear Creek Market. Williams and Cruse planned to rob persons in the market with a .357 caliber Ruger Black Hawk revolver that Williams had given to Cruse.

The two men walked to the store, but found it closed. Williams suggested that "he knew a house where we can go; they'd have a couple thousand dollars." Cruse agreed, and they walked some distance to the Kellers' house. Upon arrival at the Kellers' house, Cruse returned the Black Hawk revolver to Williams and Cruse knocked on the door. When Mr. Keller opened the door, Williams pointed the gun at him and both men entered the house.

Williams ordered the Kellers to remove all their clothes, and he remained in the kitchen with them while Cruse began searching the house for money and other valuables. After Cruse found a fully loaded .38 caliber handgun, Williams decided "to tie [the Kellers] up," and Cruse did so. The Kellers were then placed, first in one closet and later in separate closets, and both men resumed their search.

After the two men had assembled some of the Kellers' property in the living room, at Williams's suggestion, first Williams, then Cruse, raped Mrs. Keller. Afterward, Williams ordered both Kellers to take showers and put on clean clothes, which they did. Williams then directed the Kellers to "take a walk" with them. Upon hearing that the two men planned to burn the house, Mrs. Keller took the Kellers' marriage certificate with her. As the Kellers, Williams, and Cruse left the house and walked "[d]own on a dirt road and into a thicket," Williams was carrying the .38 caliber handgun and Cruse was carrying the Black Hawk revolver.

When they were in the thicket with Williams standing behind Mr. Keller and Cruse standing behind Mrs. Keller, Williams said, "We'll shoot at the count of three." Upon Williams's count of three, he shot Mr. Keller with the .38 caliber handgun and Mr.

Keller fell to the ground. However, Cruse did not shoot Mrs. Keller. Williams told Cruse to shoot Mrs. Keller because "he didn't want to leave no witnesses." Cruse then shot Mrs. Keller once with the Black Hawk revolver. After Mrs. Keller fell, Mr. Keller stood up and Williams shot him again with the .38 caliber handgun. As Cruse started to walk away, Williams said, "Wait . . . [w]hat if they ain't dead?", and he shot each of the Kellers "a couple more times apiece" with the .38 caliber handgun.

The two men returned to the house, where they loaded a television set, microwave oven, shotgun, stereo set, and speakers into Mr. Keller's jeep, and, at Williams's suggestion, set fire to the house. Williams and Cruse then took the jeep to Fredericksburg, where they sold some of the stolen property the next day. They then threw the remaining stolen property and the Black Hawk revolver into the Rappahannock River and set fire to the jeep.

Upon hearing of the Keller fire on Monday morning, Verena James advised the police that she had taken Williams and Cruse to an area not far from the Keller house on the night of the fire. Consequently, the police sought to question the two men regarding the fire. Williams and Cruse had returned to Cumberland County the Monday following the murders and the police were able to question Cruse. Williams, however, fled to Florida.

At first, Cruse furnished no information of value to the police. However, after the police discovered the bodies of the Kellers on Tuesday, Cruse consulted counsel. His counsel obtained a conditional agreement from the Commonwealth that it would not seek the death penalty provided Cruse gave a truthful statement of his knowledge of the crimes. Cruse then furnished information that implicated both men in all of the crimes charged, except for Cruse's role in Mrs. Keller's rape. Because Cruse breached his agreement in failing to tell the police that he had raped Mrs. Keller, the Commonwealth also indicted him for the Kellers' capital murders.

Testifying in his own defense, Williams agreed with Cruse: (1) that Williams was the one who suggested robbing persons at the store; (2) that Williams was the first one to shoot Mr. Keller and that Cruse was the first one to shoot Mrs. Keller; and (3) that it was Williams's idea to burn the Keller house. However, Williams (1) denied that he raped Mrs. Keller, (2) claimed that Cruse fired all the subsequent shots into the Kellers' bodies, and (3) contra-

dicted other details of Cruse's testimony about who had suggested some of their activities during and after the murders.

Lisa C. Schiermeier, a serologist, tested the seminal fluid recovered from Mrs. Keller's vagina as a part of the Physical Evidence Recovery Kit prepared by Dr. Deborah Kay, an assistant chief medical examiner who performed the autopsy on Mrs. Keller. Schiermeier compared that sample with the blood types of Cruse, Williams, and Mr. Keller. Schiermeier testified that her comparison indicated only Williams could have contributed a certain type of seminal fluid found in the sample. Dr. George C. Li, a DNA expert who performed a DNA test on the spermatozoa from the sample, testified that his test results were consistent with a conclusion that Cruse and Williams jointly contributed the seminal fluid.

## II. ISSUES PREVIOUSLY DECIDED

■ Williams raises a number of issues that we have previously decided adversely to his contentions. Williams offers no persuasive reasons to modify our previous conclusions, and we perceive none. Hence, we will adhere to our previous rejections of those contentions and will not discuss them beyond citing representative cases expressly rejecting these contentions. The first group of contentions involves Williams's claims of the unconstitutionality of the capital murder and death penalty statutes for the following reasons:

A. The statutes do not give meaningful guidance to a jury because they do not require the jury to find that aggravating circumstances outweigh mitigating ones before fixing the death penalty. Rejected in *Breard v. Commonwealth*, 248 Va. 68, 74, 445 S.E.2d 670, 674-75 (1994), and *Mickens v. Commonwealth*, 247 Va. 395, 403, 442 S.E.2d 678, 684 (1994).

B. As written and administered, the statutes fail to adequately inform the jury that a death sentence may be imposed only upon a finding beyond a reasonable doubt that aggravating circumstances outweigh mitigating ones. Rejected in *Watkins v. Commonwealth*, 229 Va. 469, 490-91, 331 S.E.2d 422, 438 (1985), *cert. denied*, 475 U.S. 1099 (1986).

C. The statutes fail to provide the sentencer with sufficient guidance as to aggravating factors to assure that the death penalty is not imposed in an arbitrary and capricious manner. Rejected in *Mickens*, 247 Va. at 402-403, 442 S.E.2d at 683-84.

D. The "future dangerousness" aggravating factor in the statutes is inherently misleading since it asks jurors to find a probability beyond a reasonable doubt. Rejected in *Mickens*, 247 Va. at 402-403, 442 S.E.2d at 684; *M. Smith v. Commonwealth*, 219 Va. 455, 477-78, 248 S.E.2d 135, 148-49 (1978), *cert. denied*, 441 U.S. 967 (1979).

E. That part of the statute, Code § 19.2-264.4(C), which allows the sentencer to find the "future dangerousness" predicate based on unadjudicated criminal conduct, violates the Eighth and Fourteenth Amendments. Additionally, if evidence of such conduct is admissible, the jury should have been instructed that it could only be considered if established beyond a reasonable doubt. Both contentions are rejected in *Breard*, 248 Va. at 74-75, 445 S.E.2d at 675, and in *Satcher v. Commonwealth*, 244 Va. 220, 228, 421 S.E.2d 821, 826 (1992), *cert. denied*, 507 U.S. ____, 113 S.Ct. 1319 (1993).

F. The "future dangerousness" aggravating factor in the statutes is inherently unreliable and is insufficient to guide jury discretion. Rejected in *Satcher*, 244 Va. at 227, 421 S.E.2d at 826, and *M. Smith*, 219 Va. at 477-78, 248 S.E.2d at 148-49.

G. The statutes as administered are unconstitutional because the infrequency of the imposition of the death penalty indicates that it is imposed arbitrarily and disproportionately upon black defendants, and the death penalty is repugnant to evolving standards of decency. Rejected in *Satcher*, 244 Va. at 228, 421 S.E.2d at 826.

H. As applied, the statutes are unconstitutional because they deny "meaningful appellate review and there is arbitrary administration of the state created right to proportionality and passion/ prejudice review." Rejected in *Mickens*, 247 Va. at 405, 422 S.E.2d at 685.

I. Additionally, Williams argues in conclusional fashion that the statutes violate the Eighth Amendment prohibition against cruel and unusual punishment, the Sixth Amendment right to a fair trial, and the Fourteenth Amendment prohibition against deprivation of a defendant's life without due process. We have rejected each of these claims in the following cases: *Beaver v. Commonwealth*, 232 Va. 521, 527, 352 S.E.2d 342, 345-46, *cert. denied*, 483 U.S. 1033 (1987) (claim of cruel and unusual punishment); *Boggs v. Commonwealth*, 229 Va. 501, 514, 331 S.E.2d 407, 417 (1985), *cert. denied*, 475 U.S. 1031 (1986) (claim of denial of

Sixth Amendment right to fair trial); and *Stamper v. Commonwealth*, 220 Va. 260, 267, 257 S.E.2d 808, 814 (1979), *cert. denied*, 445 U.S. 972 (1980) (claim of lack of due process).

Williams's second group of contentions that have been previously rejected by this Court involves the following:

A. The court erred in denying his motions for individual and sequestered *voir dire* examination of prospective jurors and for additional peremptory juror challenges. Rejected in *Breard*, 248 Va. at 75, 445 S.E.2d at 675, and *Swann v. Commonwealth*, 247 Va. 222, 228, 441 S.E.2d 195, 200 (1994).

B. The court erred in failing to provide additional discovery beyond that required under Rule 3A:11. Rejected in *Spencer v. Commonwealth*, 238 Va. 295, 303-304, 384 S.E.2d 785, 791-92 (1989), *cert. denied*, 493 U.S. 1093 (1990).

## III. ISSUES PROCEDURALLY DEFAULTED

We will not consider Williams's present objections to the exclusion of prospective jurors Thomas J. Langhorne, Bobbie Holman, and Mary D. Trent because Williams did not object to their exclusion at trial. Rule 5:25. Nor will we consider Williams's present objections to the court's grant and refusal of certain penalty phase jury instructions because the record does not indicate that Williams objected to these actions by the court. *Id.*

## IV. WAIVER OF CERTAIN CONTENTIONS

Williams did not brief, and has therefore waived, assignments of error 10 and 24. Rule 5:27(e).

Also, in his brief, Williams attempts to "incorporate by reference" a number of arguments he made in the trial court for consideration on appeal. We will not consider these arguments since they must be made in the appellate briefs. *See Mickens*, 247 Va. at 401 n.4, 422 S.E.2d at 683 n.4, and *Jenkins v. Commonwealth*, 244 Va. 445, 460-61, 423 S.E.2d 360, 370 (1992), *cert. denied*, 507 U.S. ____, 113 S.Ct. 1862 (1993) (arguments made in trial court cannot be considered on appeal merely by reference thereto in appellate brief).

## V. PRETRIAL MOTIONS

### Motion for Bill of Particulars

Williams filed a motion for a bill of particulars seeking, among other things, to require the Commonwealth to "identify every narrowing construction of [the "vileness"] factor on which it intends to offer evidence." The death penalty may be imposed if the defendant's "conduct in committing the offense [punishable by death] was outrageously or wantonly vile, horrible or inhuman, *in that it involved torture, depravity of mind or aggravated battery to the victim.*" Code § 19.2-264.4(C) (emphasis added). The necessary narrowing constructions are contained in the emphasized language of Code § 19.2-264.4(C). *See M. Smith*, 219 Va. at 478, 248 S.E.2d at 149 ("depravity of mind" and "aggravated battery" construed).

However, Williams contends that due process requires his pretrial notification of every one of these constructions upon which the Commonwealth will rely at trial. Williams makes this same argument in support of his contention that the "vileness" predicate in the death penalty statutes is unconstitutional.

■ We find no merit in his arguments. In our opinion, due process does not require that the Commonwealth limit itself to a pretrial construction of the character of Williams's conduct. Furthermore, Williams has no constitutional right to a bill of particulars if the indictments are sufficient to give him notice of the nature and character of the offenses charged, which these indictments do, so that he can make his defense. *Strickler v. Commonwealth*, 241 Va. 482, 490-91, 404 S.E.2d 227, 233, *cert. denied*, 502 U.S. 944 (1991); *Spencer v. Commonwealth*, 238 Va. at 303-304, 384 S.E.2d at 791.

### Motion for Change of Venue

■ Williams contends that the court should have granted his motion for change of venue because of the prejudicial pretrial publicity of (1) Cruse's account of the Keller murders, and (2) four other recent murders in which Williams was allegedly involved. Those murders had occurred on December 24, 1992, in the nearby town of Rice, which is in Prince Edward County. The bodies of four men were discovered in the ruins of the house where they were shot. The house apparently had been deliberately burned following their murders.

Williams has the burden of showing that there was widespread prejudice against him in Cumberland County which would be "reasonably certain to prevent a fair trial." *Mueller v. Commonwealth*, 244 Va. 386, 398, 422 S.E.2d 380, 388, *cert. denied*, 507 U.S. ___, 113 S.Ct. 1880 (1993). The decision whether to grant a change of venue is within the sound discretion of the trial court, and such decision will not be disturbed on appeal absent an abuse of that discretion. *Id.*

Williams does not claim, nor does the record disclose, that the pretrial publicity was inaccurate or that it was difficult to empanel the jury. And of the 37 prospective jurors who were examined, only 4 were required to be excused because they had formed an opinion of Williams's guilt based on the pretrial publicity. Given these circumstances, we find no abuse in the court's discretion in denying Williams's motion for a change of venue.

### Motion for Assistance of Private Investigator

Williams, an indigent, contends that the court erred in denying his pretrial motion for the appointment of a private investigator to assist his counsel in his defense. Williams asked the court to delay a ruling on that motion until he was furnished with information that the Commonwealth was to produce in response to his discovery motions. When Williams sought a ruling after completion of discovery, his request was confined to (1) an investigator's assistance in procuring information regarding a change of venue, and (2) mitigation evidence.

However, on appeal, Williams argues that this assistance was required to investigate (1) Cruse's credibility, and (2) the evidence of the Prince Edward County crimes which would be considered in the penalty phase on the issue of Williams's future dangerousness. We will not consider Williams's present arguments because they were not made in the trial court. Rule 5:25.

## VI. JURY SELECTION

### Limitation of Voir Dire

Williams argues that the court improperly limited his *voir dire* examination by refusing to permit him to ask prospective jurors about their "perceptions on parole law." Williams concedes that he was not ineligible for parole when this case was tried. Accordingly, the trial court ruled correctly that Williams was not

allowed to inject issues of parole in his *voir dire* questions. *Ramdass v. Commonwealth*, 248 Va. 518, 520-21, 450 S.E.2d 360, 361 (this day decided); *Wright v. Commonwealth*, 248 Va. 485, 486, 450 S.E.2d 361, 362 (this day decided).

## *Retention and Exclusion of Prospective Jurors*

### *Gary Davis*

 Williams contends that the trial court applied the wrong standard in refusing to disqualify prospective juror Davis. During *voir dire*, Davis said that it would be "tough" to "overlook the death penalty" and impose a life sentence if the Commonwealth proved the aggravating circumstances. According to Williams, the trial court "erroneously applied a standard which would disqualify prospective jurors only if they would *automatically* vote for the death penalty."

However, Williams voiced no such contention in the trial court. Accordingly, we will not consider this contention on appeal. Rule 5:25.

### *Sharon Barrett Baldwin*

Williams complains that the court erroneously excluded prospective juror Baldwin. In deciding whether to exclude a prospective juror, the trial court must determine whether the prospective juror's views " 'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Eaton v. Commonwealth*, 240 Va. 236, 246, 397 S.E.2d 385, 391 (1990) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)), *cert. denied*, 502 U.S. 824 (1991). And, in considering this matter on appeal, we defer to the trial court's decision because the trial judge has seen and heard the prospective jurors and is in a better position than we are to rule on these issues. *Breard*, 248 Va. at 77, 445 S.E.2d at 676. Accordingly, we will not reverse the ruling on appeal in the absence of a showing of "manifest error." *Eaton*, 240 Va. at 246, 397 S.E.2d at 391.

 Baldwin testified that she would automatically refuse to impose the death penalty because of her religious beliefs, and that she would not consider the court's directions to consider a death sentence as well as a "life" sentence. Her final answer was that she "would have a very, very hard time [considering the death

penalty]." Considering Baldwin's expression of her religious beliefs and her apparent reluctance to consider the court's directions, we find no manifest error in excusing her.

## VII. GUILT PHASE

### Failure to Grant Mistrial

Verena James testified that she had received a monetary reward for supplying evidence about the Keller fire. She was then asked if she knew of such a reward before she supplied her information to the police. She responded, "No. Through the media I had heard about the Rice fires." This unresponsive answer was an apparent reference to the four recent murders and the arson of the house in Rice.

According to Williams, this information "impermissibly placed before the jurors, at the guilt phase of the trial, the unadjudicated acts of murder." However, there is no contradiction in the record of the trial court's observation that "[n]othing was said about connecting this gentleman with anything about the Rice fires."

Moreover, Williams declined the court's offer to instruct the jury to disregard that testimony. Under these circumstances, we find no abuse of discretion in the court's refusal to declare a mistrial.

### Admission of Photographs of Victims and Crime Scene

Williams complains of the allegedly excessive and, therefore, prejudicial number of photographs of the Kellers' bodies at the scene of their murders. Six photographs, some taken from a distance and others taken from a point closer to the bodies, all with different views of the bodies, were introduced in evidence.

The well-established rule is that admission into evidence of "photographs depicting victims and the crime scene is a matter resting within the sound discretion of the trial court." *Breard*, 248 Va. at 82, 445 S.E.2d at 678. We find no abuse of that discretion in the admission of these photographs.

### Alleged Errors During Cruse's Testimony

Williams contends that the trial court erred in three rulings during Cruse's testimony. We find no merit in any of these contentions.

First, Williams contends that by allowing Cruse to testify on direct examination that he had no plea agreement with the Commonwealth in exchange for his testimony, the court improperly permitted the Commonwealth "to bolster" Cruse's testimony on direct examination. Williams correctly points out that ordinarily evidence of a witness's credibility is not admissible until the witness's credibility is attacked. *See Jordan v. Taylor*, 209 Va. 43, 48-49, 161 S.E.2d 790, 794 (1968) (improper to elicit testimony from witness tending to bolster that witness's credibility).

However, the order of proof in a trial is a matter committed to the sound discretion of the trial court, and we will not reverse a ruling varying the order of proof in the absence of an abuse of discretion. *Quintana v. Commonwealth*, 224 Va. 127, 142, 295 S.E.2d 643, 650 (1982), *cert. denied*, 460 U.S. 1029 (1983) (sustaining admission of evidence in rebuttal phase of case more appropriately admissible in case-in-chief); *Hargraves v. Commonwealth*, 219 Va. 604, 608, 248 S.E.2d 814, 817 (1978) (permitting Commonwealth to reopen case after it rested and court heard defendant's motion to strike Commonwealth's evidence). Since Williams advised the court that he planned to attack Cruse's credibility, we find no abuse of that discretion in this case.

Next, Williams argues that the court erred in admitting part of Cruse's testimony. Cruse had testified on direct examination that he was being prosecuted for capital murder arising from the Keller incidents. On cross-examination, Cruse was asked whether he was testifying "to help [him]self in making [his] case." Cruse responded, "I'm getting it off my chest." Cruse was then asked whether he was "also getting the death penalty off [his] back." Cruse simply responded, "Not really."

Over Williams's objection, Cruse testified on redirect examination that he was unable to look at the pictures of the murder scene because he "lost it." In our opinion, evidence that Cruse was upset by the pictures was appropriate corroboration of his testimony that he wanted to "get it off [his] chest," and, therefore, proper rebuttal to the suggestion that he was "getting the death penalty off [his] back."

Williams's final contention regarding Cruse's testimony is that the court erred in refusing to permit Williams to show Cruse's conviction of an assault and battery. Williams recognizes that because misdemeanor assaults and batteries are not crimes of moral turpitude, evidence of convictions of those crimes is not admissible

to attack a witness's credibility. *Clark v. Commonwealth*, 202 Va. 787, 790, 120 S.E.2d 270, 272 (1961). However, because he claims that Cruse's credibility and "proclivity for assaultive behavior was a crucial factor for the jury to decide," Williams contends that this evidence should have been admitted. However, he cites no supporting authority.

■ *Clark* states the applicable rule:

> The rule is well settled in Virginia that a witness cannot be asked on cross-examination questions as to collateral independent facts irrelevant to the issue being tried, though bearing on the question of veracity, for the purpose of testing his credibility.

*Id.* at 789, 120 S.E.2d at 272. We see no reason to create the suggested exception to this rule. Cruse admits he fired the first shot at Mrs. Keller, thereby virtually eliminating any doubt of his "proclivity for assaultive behavior." Accordingly, the trial court correctly excluded this testimony as an inadmissible attack upon Cruse's credibility.

### Testimony of Tammy Lynn Tolley

Williams maintains that the court erred in the manner in which it permitted Tammy Lynn Tolley to identify him as one of the two men from whom she bought some of the Kellers' property on the day after the Kellers were murdered. When Tolley began testifying, she could not identify Williams by looking at persons in the courtroom. However, over Williams's objection, she identified a photograph of him that had been shown to her shortly after she had bought some of the stolen property.

Later, while responding to a question on another subject, Tolley volunteered, "That's the guy right over there. I didn't see him sitting over there." The Commonwealth's attorney responded, "After looking at him, she identified him," and Tolley said, "I mean, I looked out there. I didn't look up here."

■ We do not agree with Williams's contention that this was another effort "to rehabilitate" the witness prior to cross-examination. Rather, it was a permissible examination to establish that, on a prior occasion, Tolley had identified Williams as one of the men from whom she bought some of the Kellers' property.

## Alleged Improper Cross-Examination of Williams

 The witnesses had been excluded from the courtroom when not testifying. Williams contends that the trial court erred in permitting the Commonwealth to ask Williams on cross-examination whether he was the only witness who had been present in the courtroom and heard the testimony of witnesses who had already testified.

According to Williams, this question "impermissibly burdened Williams' [constitutional] right to confront his accusers, to be present at all times during his trial, to present evidence in his favor and to compel process." However, Williams cites no case in which such a question has been held to violate a defendant's constitutional rights, and we find none. We fail to see how those rights are violated by a question that reflected what the jury already knew. Accordingly, we find no merit in this contention.

## Admission of Williams's Out-of-Court Statement

Officer John Richard Holt brought Williams back to Cumberland County from Georgia, where Williams was arrested. During the return trip, Holt answered a number of Williams's questions.

Holt testified during the Commonwealth's case-in-chief that in response to Williams's questions, Holt told Williams that the Black Hawk revolver had been recovered from the Rappahannock River. When Williams later asked what Cruse had told the police about the Keller incidents, and Holt said that Cruse had "told us the whole story," Williams responded, "I can prove Jeff had that goddamn Black Hawk."

 Willams contends that the court erred in permitting the last out-of-court hearsay statement by Williams. We disagree. Although Williams may have thought that his statement was exculpatory, the statement linked him to the Keller incidents and was thus admissible as a party admission exception to the hearsay rule. *Stewart v. Commonwealth*, 245 Va. 222, 236, 427 S.E.2d 394, 403, *cert. denied*, 510 U.S. ___, 114 S.Ct. 143 (1993) (statement to witness prior to defendant's wife's murder that defendant had consulted counsel regarding divorce admissible under party admission exception to hearsay rule).

*Instructions*

Williams contends that the court erred in granting Instruction 18 which told the jury that:

You may find the defendant guilty of capital murder if the evidence establishes that the defendant jointly participated in the fatal shooting, if it is established beyond a reasonable doubt that the defendant was an active and immediate participant in the act or acts that caused the victim's death.

In *Strickler*, we noted that "where two or more persons take a direct part in inflicting fatal injuries, each joint participant is an 'immediate perpetrator' for the purposes of the capital murder statutes." 241 Va. at 495, 404 S.E.2d at 235. However, Williams contends that *Strickler* is distinguishable from this case because in *Strickler* two persons used a heavy rock to kill the victim. Here, Williams notes that "the deaths were caused by a firearm which only requires the action of one person in pulling the trigger."

However, Williams overlooks Cruse's testimony that both he and Williams shot Mrs. Keller in the head, that Cruse used the Black Hawk revolver, and that Williams used the .38 caliber handgun. He also overlooks the testimony of Dr. Kay. Although Dr. Kay testified that any one of Mrs. Keller's three facial wounds "could" have been lethal, she concluded in her autopsy report that Mrs. Keller's death was caused by three "[g]unshot wounds of face."

Accordingly, the jury could have found from the evidence that Williams and Cruse each took a direct part in inflicting Mrs. Keller's fatal injuries. Hence, the instruction was proper for that reason.

Next, in assignment of error 28, Williams contends that the court erred in refusing his tendered Instructions 19 and 20. However, he merely "incorporates by reference" the argument he made in the trial court in support of his present contention. As we have noted earlier, we will not consider arguments presented in the trial court that are simply incorporated by reference in an appellate brief. Accordingly, Williams has waived this contention.

### Sufficiency of Evidence

Williams maintains that the evidence is insufficient in several respects to support his convictions for capital murder. First, he claims that Cruse killed Mrs. Keller with the first shot. However, as we have noted earlier, Dr. Kay's testimony was sufficient to indicate that Mrs. Keller was killed by the combination of the three shots to her face.

Next, Williams argues that the evidence is insufficient to show that he killed Mr. Keller since Mr. Keller stood up after Williams shot him. However, even if Williams did not kill Mr. Keller on the first shot, the jury could have found that Williams did so later when, according to Cruse, Williams fired the remaining shots into Mr. Keller's body.

Thus, in our opinion, there is sufficient evidence to support the jury's finding that Williams had actively participated in the murders of both Mr. and Mrs. Keller. Additionally, the evidence amply supports the factual finding that Williams killed both Kellers as a part of the same acts or transactions of robbing them and raping Mrs. Keller.

As his final argument on the sufficiency of the evidence, Williams contends that the "predicate felonies of rape and robbery were not sufficiently close in time and place to the murders of Mr. and Mrs. Keller to elevate those murders to capital murder." We disagree.

The evidence indicates that Williams and Cruse went to the Kellers' house intending to rob them and, while committing the robbery, they raped Mrs. Keller. The evidence also shows that they killed the Kellers because Williams "didn't want to leave no witnesses." In our opinion, this evidence amply supports the conclusion that the robberies, the rape, and the subsequent murders were "so closely related in time, place, and causal connection as to make the killing[s], as a matter of law, a part of the same criminal enterprise." *Briley v. Commonwealth*, 221 Va. 532, 544, 273 S.E.2d 48, 56 (1980), *cert. denied*, 451 U.S. 1031 (1981).

Additionally, one of the specifically defined acts of capital murder is the "willful, deliberate, and premeditated murder of any person, in the commission of, or subsequent to, rape." Code § 18.2-31(5). There is no doubt that the Kellers were murdered shortly after Mrs. Keller's rape. Accordingly, we conclude that the evidence is sufficient to sustain Williams's capital murder convictions.

### Alleged Double Jeopardy Violation

Williams contends that he was put in double jeopardy by his conviction of five charges of capital murder when only two people had been killed, thereby violating the proscriptions against double jeopardy contained in the Fifth Amendment of the Constitution of the United States, Article I, Section 8 of the Virginia Constitution, and Code § 19.2-294. We disagree.

We need not consider whether Williams was charged with multiple offenses arising from the same act or offense since he was prosecuted for those offenses in the same trial. *Blythe v. Commonwealth*, 222 Va. 722, 725, 284 S.E.2d 796, 798 (1981). We are concerned only with his constitutional and statutory rights not to be subjected to multiple punishments for the same act or offense. *Thomas v. Commonwealth*, 244 Va. 1, 9, 419 S.E.2d 606, 610, *cert. denied*, 506 U.S. ___, 113 S.Ct. 421 (1992). Here, although Williams was convicted of five charges of capital murder, each based separately upon proof beyond a reasonable doubt, the jury fixed only one death sentence for each victim. Under these circumstances, Williams was not subjected to multiple punishments for what he claims was the same act or offense. *Id.*

## VIII. PENALTY PHASE

### Admission of Photographs of Other Murders

Williams confessed to John Howard Williams, his brother, that he had shot and killed the four men and set fire to the house in Rice. The court permitted the Commonwealth to introduce photographs of each victim's head showing that each had been shot in the head and that parts of the head were partially burned.

The Commonwealth claimed that the photographs were relevant not only to establish Williams's future dangerousness by indicating the atrociousness of the Prince Edward County murders, but also to corroborate the testimony of John Williams as to Williams's confession to him. The court admitted the photographs over Williams's objection that the four victims' autopsy reports, which were admitted in evidence, showed the same things that the photographs did and that the photographs were inflammatory. The parties make the same arguments on appeal.

The fact that the autopsy reports reflect the same facts as the photographs does not make the photographs inadmissible. *See Spencer*, 238 Va. at 312, 384 S.E.2d at 796 (even though video-

tape of crime scene admitted in evidence, still photographs of crime scene also admissible). And the decision whether to admit photographic evidence of the crime establishing the same facts as another exhibit is within the sound discretion of the trial court. *Id.* at 312, 384 S.E.2d at 796. We think that the photographs were relevant for the reasons advanced by the Commonwealth, and we find no abuse of the trial court's discretion in admitting them in evidence.

### *Passion, Prejudice, or Other Arbitrary Factor*

Williams argues that the introduction of "[t]he pictures of the charred bodies of the victims of the Prince Edward [County] killings" inflamed the jury so that "there was no question but that the jury would impose the death penalty after viewing them." However, we find nothing in the record to indicate that the jury disregarded the trial court's instruction to consider the photographs only for the purpose of showing Williams's "future dangerousness" in deciding the Cumberland County case.

Additionally, Williams claims that "the passion and prejudice of the jury were further aroused by the Commonwealth's calling family members to testify during the sentencing hearing." We note that Mary Carter Williams, Mrs. Keller's mother, was the only family member called as a witness by the Commonwealth during the sentencing hearing. Mrs. Williams testified only as to her daughter's age and marriage to Mr. Keller and identified a photograph of the Kellers. The record does not disclose that Mrs. Williams displayed any particular emotion during the short period of her testimony.

Williams concludes that this was an indirect method of introducing inadmissible victim impact evidence, although Williams voiced no objection whatever to Mrs. Williams's testimony. We do not consider the testimony to have been victim impact evidence, nor does the record disclose that it aroused the passion of the jury, as Williams contends.

Next, Williams suggests that the sentence was influenced by passion, prejudice, or other arbitrary factors because the jury imposed the death penalty despite his mitigating evidence. This evidence indicated that Williams suffered from a childhood mental disorder known as Attention Deficit Hyperactivity Disorder (A.D.H.D.), which adversely affected him in school and limited his ability to function in society as he matured. Dr. Dewey G.

Cornell, a clinical psychologist, testified that persons suffering from A.D.H.D. are likely to be involved in substance abuse and engage in impulsive and sometimes illegal behavior.

Noting his own history, Williams contends that the effects of his disorder were exacerbated by his unstable home life and a sexual assault by an older man when Williams was 14 years old. Williams's mother, Carolyn Green Lipscomb, divorced his father shortly before he was born and married Arthur Williams, an alcoholic. Lipscomb divorced Arthur Williams after several years of verbal and emotional abuse. Thereafter, Lipscomb had several "relationships" with men, and Lipscomb testified that "not all [were] pleasant." However, one of those men, Dwayne Copeland, had a good "relationship" with Lipscomb, and she and Copeland planned to be married. When Copeland was killed in an automobile accident a few months before the planned marriage, Lipscomb testified that Williams was "devastated."

Williams points out that despite these difficulties, the testimony of his family members indicated that he was a caring, loving, generous, and dependable person who was not seen to be cruel or abusive to animals or to people. We have reviewed all of Williams's mitigating evidence and find nothing in it that would compel the jury to impose life sentences rather than death sentences.

Independent of Williams's specific complaints on this subject, we have also reviewed the record, as required by Code § 17-110.1, to ascertain if there is any indication that the jury, in imposing the death sentence, was influenced by passion, prejudice, or any other arbitrary factor. Our independent review discloses no such indication.

### Proportionality

As required by Code § 17-110(C)(2), we also consider whether Williams's "death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the criminal." Prior to the Prince Edward County murders, Williams had no convictions for violent crimes, but he had several felony convictions for automobile theft and for possession of marijuana. However, we must also consider that Williams was the sole participant in the Prince Edward County murders and arson. Further, Williams suggested the robberies, the rapes, the execution-type killings of the Kellers, and the arson of their house. In our opinion, this evidence amply justifies the jury's find-

ing of the "vileness" of the Keller murders and of Williams's "future dangerousness."

To assist us in our proportionality review, we have considered the compilation of the records of all capital murder cases reviewed by this Court pursuant to Code § 17-110(E). We have paid particular attention to those cases in which the death sentence was based on both the "vileness" and the "future dangerousness" predicates. These cases are collected in *Spencer*, 238 Va. at 319-20, 384 S.E.2d at 799-800. We have collected the cases since *Spencer* in *Mueller*, 244 Va. at 413-14, 422 S.E.2d at 397. Since *Mueller*, the following cases have imposed death sentences based on both predicates: *Burket v. Commonwealth*, 248 Va. 596, 450 S.E.2d 124 (this day decided); *Breard*, 248 Va. at 89, 445 S.E.2d at 682; and *Mickens*, 247 Va. at 412, 442 S.E.2d at 689.

█ Based upon our review of these records, as well as of cases in which life sentences were imposed, we conclude that Williams's death sentences are not excessive or disproportionate to the penalties imposed by other sentencing bodies in Virginia for similar conduct, considering both the crimes and the defendant.

## IX. CONCLUSION

We find no reversible error in the judgments of the trial court, and we perceive no other reason to set aside the sentences of death. Accordingly, we will affirm the convictions and sentences involved in these appeals.

*Affirmed.*