Present:  All the Justices

ANDRE L. GRAHAM

v.  Record Nos. 942189 and 942192

OPINION BY JUSTICE HENRY H. WHITING
June 9, 1995

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
James B. Wilkinson, Judge

Andre L. Graham was tried upon indictments charging him with eight felonies arising out of the October 8, 1993 shootings of Sheryl L. Stack and Edward Martin.  One indictment charged Graham with Stack's capital murder with a deadly weapon during the commission of Martin's robbery, another indictment charged Graham with an attempt to rob Stack, two indictments charged Graham with Martin's robbery and malicious wounding, and the remaining four indictments charged Graham with the use and display of a firearm in a threatening manner during the commission of the foregoing four felonies.

In the first stage of a bifurcated trial conducted pursuant to Code §§ 19.2-264.3 and -264.4, a jury convicted Graham of all eight charges.  A subsequent proceeding was conducted under the provisions of Code § 19.2-295.1 in which the Commonwealth introduced Graham's record of prior convictions.[*]  The jury then

---

[*]Graham's prior convictions were:  <u>November 20, 1991</u>: unauthorized use of an automobile, assumption of the name of another, concealed weapon, trespass on posted property; <u>January 17, 1992</u>:  failure to appear in court, possession of cocaine, possession of cocaine with firearm; <u>August 25, 1994</u>:  capital murder, use of firearm in commission of capital murder, robbery, use of firearm in commission of robbery, capital murder, robbery, use of firearm in commission of robbery.

fixed Graham's punishments at the following periods of imprisonment for six of the non-capital convictions: life for the aggravated malicious wounding, 25 years for the robbery, 10 years for the attempted robbery, and five years each for three of the firearm convictions, all of which the court imposed.

In the second stage of the capital murder trial, the jury fixed Graham's punishment for the capital murder of Stack at death based on its findings of "future dangerousness" and "vileness," and at five years imprisonment for the firearm conviction in connection with the murder. The court then referred the matter to the probation officer for an investigation and report pursuant to the provisions of Code § 19.2-264.5. After considering the report, the court imposed the death sentence and the penitentiary sentence for the firearm conviction.

Graham is before this Court for automatic review of his death sentence, Code § 17-110.1(A), and we have consolidated that review with the appeal of his capital murder conviction. Code § 17-110.1(F). We have also certified Graham's appeal of his remaining convictions from the Court of Appeals, transferring jurisdiction over that appeal to this Court pursuant to Code § 17-116.06, thereby consolidating all these matters.

Since the Commonwealth prevailed in the trial court, we review the evidence and all reasonable inferences arising therefrom in the light most favorable to the Commonwealth. Swann

-2-

v. Commonwealth, 247 Va. 222, 225, 441 S.E.2d 195, 198, cert. denied, ___ U.S. ___, 115 S.Ct. 234 (1994).

EVIDENCE

After finishing their work at the Steak and Ale Restaurant on Midlothian Turnpike in south Richmond on the night of October 7, 1993, Stack drove her Volvo sedan and Martin drove his red sports car to another restaurant in Richmond where they had something to eat. James Jones, the night auditor of a motel adjacent to the Steak and Ale Restaurant parking lot, was standing outside the motel talking to another employee when he saw Stack and Martin return to the parking lot after 2:00 a.m. on October 8. Jones noticed Stack and Martin standing beside one of the two cars talking and kissing until Jones returned to work inside the motel. Twenty to twenty-five minutes later, Jones heard two loud noises, "two or three seconds [apart], maybe up to ten seconds" and saw a third car being driven from the area.

When Jones looked toward the parking lot, he noticed that the Volvo's engine was running and its lights were on, but that the red sports car was gone. As he walked toward the Volvo, Jones noticed a body lying on the ground and immediately called the police.

Harold Giles, a Richmond Police officer who was in the immediate area, got Jones's call "[a]bout 3:59 [a.m.]" and was at "the scene `within a minute or so.'" He found Stack and Martin, both shot in the head, lying face down in a pool of blood, with

-3-

their hands touching.  Giles testified that "they were trying to communicate to each other, but I couldn't make out what they were saying."  In addition to observing that the Volvo's engine was running and its lights were on, Giles also noticed that the front passenger door was open.  Giles "protect[ed] the crime scene until the detectives arrived."

When Detective Thomas R. Searles arrived at the scene at "approximately" 6:00 a.m., Stack and Martin had been taken to the hospital.  Searles took photographs and collected the physical evidence.  One photograph of the front seat of Stack's car shows that it had been ransacked, with Stack's personal property and purse in disarray in the front seat.  Searles found a .45 caliber cartridge case and two .45 caliber bullets that were approximately one foot apart.

Stack was comatose when she arrived at the hospital and died some time later without regaining consciousness.  Although Martin had been shot in the head and suffered extensive brain injuries, he survived and was able to testify.  Dr. William Broaddus, a neurosurgeon who treated Martin, testified that the bullet that entered Martin's head damaged the left side of his brain, resulting in Martin's loss of his left eye, a partial paralysis on the right side of his body, and an impairment in his ability to generate language.  However, Dr. Broaddus said that Martin's comprehension, memory, and intelligence were perfectly normal, only his "ability to express what he is thinking is

-4-

impaired. . . . It just takes him a lot longer and with a lot more effort."

Martin testified that he and Stack were seated in her car in the parking lot when a man Martin later identified from a photographic spread as Graham approached the car. Graham had a gun and told them to get out of the car. After Stack and Martin got out of the car, Graham told Martin to hand over his wallet and car keys to another man who was with him, but unarmed. As Graham held "the gun on [Stack and Martin]," the other man first got in Stack's car and started it, then got in Martin's car, where, according to Martin, the other man "saw" Martin's compact disc recordings (CDs). While the other man was in Martin's car, Graham told Stack and Martin that if they would lie down on the parking lot and close their eyes, he would not hurt them. Even though both did as they were directed, they were each shot in the head as they lay on the ground with their eyes closed.

Although Martin does not remember how long it was after he closed his eyes that he was shot, Graham was the last person Martin saw with a gun before he closed his eyes. After he was shot, Martin realized that his "car was being started and the car was coming at [him] so [he] quickly rolled over to get out of the way of the car." After they were shot, Stack and Martin were holding hands and he was trying to talk to her.

Priscilla Booker, who had been living with Graham in an apartment on Midlothian Turnpike since early July 1993, testified

-5-

that on the morning of Stack's murder, she saw Graham in the same red car as that shown in a police photograph of Martin's car. Later that morning, as Booker was watching the news on a local television station, she mentioned to Graham the reports of the shooting in the Steak and Ale parking lot. Graham's response was, "why do [you] worry about other people."

Graham then asked Booker to stop looking at the news and, when she continued to do so, he became upset. When Booker asked Graham why she should not watch the news, he replied that "he knew who did it[,] but he didn't."

Two or three days after the Stack murder, Booker found Martin's box of over 200 CDs in the trunk of her car. Graham told her that he had bought these CDs for $10, and Booker put them in storage. The police recovered Martin's car a few days after the crimes, but were unable to obtain any useful fingerprint evidence from it.

On the morning of December 3, 1993, Graham, who was incarcerated in the Chesterfield County jail on another charge, made a telephone call to Booker in the presence of Gary McGregor, a Chesterfield County deputy sheriff. Graham told Booker several times during the conversation to "go into the closet, get the bag with the contents and get rid of it." McGregor immediately reported this conversation to his superiors. Shortly thereafter, Detective W.F. Showalter of the Chesterfield County Police Department went to Booker's apartment. There he found a .45

-6-

caliber pistol in a plastic bag in a linen closet.

The gun was heavily oiled, and the police were unable to recover any fingerprints from it. However, Booker testified that she had seen the transaction in which Graham had obtained the gun in September 1993, and that since that time, Graham had kept it in his constant possession. Booker testified that Graham even slept with it. After examining the gun, the bullets, and the cartridge case found at the scene, Ann Davis Jones, a firearms identification expert, testified that Graham's gun was the weapon from which the bullets and the cartridge case found at the scene had been fired and ejected.

The police found Martin's CDs in a storage locker rented by Booker's mother. The CDs were examined by Leland W. Kennedy, a fingerprint expert, who testified that 31 of the 48 identifiable fingerprints found on the CDs were those of Graham.

## ISSUES PREVIOUSLY DECIDED

Five of the issues that Graham presents for appeal he candidly admits we have previously decided adversely to his contentions. He further states that he "has no additional argument that has not been raised by other death penalty defendants in cases previously cited by this court." We know of no reasons to modify our previous decisions and, therefore, reject each of the following claims:

1. The statutes fail "to guide the jury's discretion in its consideration of the `vileness' and `future dangerousness'

aggravating factors."  Rejected in <u>Williams v. Commonwealth</u>, 248 Va. 528, 535, 450 S.E.2d 365, 371 (1994).

2.  The capital murder statutes "allow the jury to use the evidence of prior convictions to impose the sentence of death, violating defendant's protection against double jeopardy." Rejected in <u>Joseph v. Commonwealth</u>, 249 Va. 78, 82, 452 S.E.2d 862, 865 (1995); <u>Mickens v. Commonwealth</u>, 247 Va. 395, 404, 442 S.E.2d 678, 684-85, <u>vacated on other grounds</u>, ___ U.S. ___, 115 S.Ct. 307 (1994).

3.  "The death penalty, per se, constitutes cruel and unusual punishment under current standards of decency."  Rejected in <u>Joseph</u>, 249 Va. at 82, 452 S.E.2d at 865; <u>Williams</u>, 248 Va. at 536, 450 S.E.2d at 371.

4.  The "[f]ailure to give adequate jury instructions on mitigation, use of model jury instructions, and jury verdict forms inhibits the jury from giving independent weight to aspects of the defendant's character and record and to circumstances of the offense that are proffered in mitigation."  Rejected in <u>Breard v. Commonwealth</u>, 248 Va. 68, 74, 445 S.E.2d 670, 675, <u>cert. denied</u>, ___ U.S. ___, 115 S.Ct. 442 (1994).

5.  The "[f]ailure of Virginia to provide for meaningful appellate review deprives [Graham] of statutory rights and due process of law."  Rejected in <u>Joseph</u>, 249 Va. at 82, 452 S.E.2d at 865; <u>Williams</u>, 248 Va. at 536, 450 S.E.2d at 371.

GUILT PHASE

Graham does not argue that the evidence is insufficient to establish his presence when these crimes were committed. Indeed, in exercising his right of allocution before sentencing, Graham told the court, "[i]t was three of us there," but Graham denied that he was the "triggerman."

Graham contends that the evidence is insufficient to prove that he was the "triggerman." Since Martin cannot remember how long it was after he closed his eyes before he and Stack were shot, Graham argues that the Commonwealth had the burden of excluding the hypothesis that Graham might have given the gun to the other man, who then shot Stack and Martin.

Nothing in the evidence suggests that Graham may have given the gun to the other man in the interval between the time Martin closed his eyes and he and Stack were shot. Instead, Graham's ownership of the gun, his retention of the gun even when sleeping, Martin's testimony, and Graham's direction to Booker to "get rid of the bag" containing the gun, taken together, amply justify the conclusion that Graham was the person who shot the victims.

Since nothing in the evidence supports Graham's hypothesis, we conclude that his hypothesis does not spring from the evidence, but from the imagination of Graham's counsel. Therefore, the Commonwealth had no duty to negate this hypothesis. Cook v. Commonwealth, 226 Va. 427, 433, 309 S.E.2d 325, 329 (1983); Turner v. Commonwealth, 218 Va. 141, 148-49, 235

S.E.2d 357, 361 (1977). Accordingly, we find no merit in this contention.

Next, Graham contends that the court erred in failing to give an instruction that he described as a "cautionary eyewitness identification instruction." This instruction provided:

In deciding what the facts are, you must consider all the evidence. In doing this, you must decide which testimony to believe and which testimony not to believe. You may disbelieve all or any part of any witness's testimony. In making that decision, you may take into account a number of factors including the following:

1. Was the witness able to see, or hear, or know the things about which the witness testified?

2. How well was the witness able to recall and describe those things?

3. What was the witness's manner while testifying?

4. Did the witness have any interest in the outcome of this case or any bias or prejudice concerning any party or any matter involved in the case?

5. How reasonable was the witness's testimony considered in light of all the evidence in the case?

6. Was the witness's testimony contradicted by what that witness has said or done at another time, or by the testimony of other witnesses, or by other evidence?

In deciding whether or not to believe a witness, keep in mind that people sometimes forget things. You need to consider therefore whether a contradiction is an innocent lapse of memory or an intentional falsehood, and that may depend on whether it has [to] do with an important fact or with only a small detail.

These are some of the facts you may consider in deciding whether to believe testimony.

The weight of the evidence presented by each side

does not necessarily depend on the number [of] witnesses testifying on one side or the other. You must consider all the evidence in the case, and you may decide that the testimony of a smaller number of witnesses on one side has greater weight than that of a larger number on the other.

All of these are matters for you to consider in finding the facts.

We rejected a similar claim in Satcher v. Commonwealth, 244 Va. 220, 256, 421 S.E.2d 821, 843 (1992), cert. denied, 507 U.S. ___, 113 S.Ct. 1319 (1993). Since the Satcher jury was fully instructed on the presumption of innocence and reasonable doubt, we held that a separate instruction on identity was not required. Here, the court fully instructed the jury on the presumption of innocence, the Commonwealth's burden of proving guilt beyond a reasonable doubt, the consideration of circumstantial evidence, and the assessment of the credibility of witnesses and the weight of the evidence. Accordingly, we conclude that Graham's proposed instruction was not required, and that the court did not err in refusing to grant it.

Finally, Graham contends that the trial court erred in its refusal to set the verdicts aside and grant a new trial because of the Commonwealth's alleged violation of the court's order requiring it to disclose all exculpatory evidence prior to trial. According to Graham, this alleged violation deprived him of the due process rights articulated in Brady v. Maryland, 373 U.S. 83 (1963).

The alleged exculpatory evidence was the misidentification

by Martin of the other man present at the scene in a photographic spread of six suspects presented at the same time Martin picked Graham from another photographic spread. Prior to trial, the Commonwealth advised Graham only that Martin was unable to identify the other man. However, we will not consider this contention since Graham learned of Martin's misidentification during his cross-examination of one of the Commonwealth's witnesses, and he failed to bring the matter to the court's attention at that time by way of a motion for mistrial, a motion for a continuance, or a request for other relief. Instead, he used the fact of Martin's misidentification to his own advantage in his argument to the jury and raised the <u>Brady</u> issue only after the jury returned an adverse verdict. By that time, he had waived the point. Therefore, we will not consider his claim that the court erred in denying his motion for a new trial. Rule 5:25.

SENTENCE REVIEW

Graham does not argue either that his death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, or that it is excessive or disproportionate to the penalty in similar cases. Nevertheless, we have reviewed his death sentence on the record pursuant to the mandate of Code § 17-110.1.

At the sentencing phase, the Commonwealth referred to Graham's record of previous convictions. It also introduced

-12-

testimony showing Graham's two prior capital murder convictions on August 25, 1994. These capital murder convictions arose from Graham's participation in the murder and robberies of a Chesterfield County couple on November 30, 1993. Both were shot in the head.

Graham introduced mitigation evidence. Sherry Oliver, a 22-year-old friend of Graham, testified that Graham "was polite" and never got angry with her or her two children. Jacqueline Graham, Graham's mother, testified that he was 24 years old, that he had one child, age 4, that he was always "very respectful" with her and any other adult, and that he had never been violent in his life.

Dr. Leigh D. Hagan, a forensic psychologist who examined and tested Graham, testified that Graham had "an overall intelligence score of 84, which places him mid-way in the lower average range. . . . It tells us that this is not a matter of mental retardation." Dr. Hagan described the results of researchers who studied the incarceration history of 453 murderers whose death sentences had been commuted to life imprisonment and found that only nine-tenths of one percent committed other homicides in prison during the following 15 years of imprisonment. Based upon this study and his examination of Graham, Dr. Hagan opined that Graham "will not pose any greater threat, ongoing threat to society than any other murderer given a life sentence."

However, our review discloses nothing in the record to

indicate that the jury was influenced by any arbitrary factor in imposing the death sentence.  And clearly the jury's findings of both the "vileness" and "future dangerousness" factors are amply supported by the evidence.

Further, we have examined the records that we have compiled of all capital murder cases reviewed by this Court, Code § 17-110.1, including those in which life sentences were imposed.  In doing so, we have paid particular attention to those cases in which the sentence was based on both the "vileness" and "future dangerousness" predicates.  Those cases are collected in Spencer v. Commonwealth, 238 Va. 295, 318-20, 384 S.E.2d 785, 799-800 (1989), cert. denied, 493 U.S. 1093 (1990), supplemented in Mueller v. Commonwealth, 244 Va. 386, 413-14, 422 S.E.2d 380, 397 (1992), cert. denied, 507 U.S. ___, 113 S.Ct. 1880 (1993), and in Williams, 248 Va. at 550, 450 S.E.2d at 379.  Since Williams, the following cases also have considered sentences in which both predicates were involved:  Wilson v. Commonwealth, 249 Va. 95, 452 S.E.2d 669 (1995), and Burket v. Commonwealth, 248 Va. 596, 450 S.E.2d 124 (1994), cert. denied, ___U.S. ___, 115 S.Ct. 1433 (1995).  Based upon our review of these records, we conclude that Graham's death sentence was not excessive or disproportionate, considering both the crime and the defendant.

CONCLUSION

Finding no error in the trial court's judgments and perceiving no other reason to set aside the sentence of death, we

-14-

will affirm the convictions and sentences.

Record No. 942189 -- <u>Affirmed</u>.

Record No. 942192 -- <u>Affirmed</u>.
