UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ANDRE L. GRAHAM,
Petitioner-Appellant,

v.

No. 99-4

RONALD J. ANGELONE, Director,
Virginia Department of Corrections,
Respondent-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Robert G. Doumar, Senior District Judge.
(CA-97-270-2)

Argued: June 10, 1999

Decided: September 13, 1999

Before WIDENER, NIEMEYER, and TRAXLER, Circuit Judges.

_____

Affirmed in part and dismissed in part by unpublished opinion. Judge
Traxler wrote the opinion, in which Judge Widener and Judge Nie-
meyer joined.

_____

**COUNSEL**

**ARGUED:** Larry W. Shelton, SHELTON & MALONE, P.C., Nor-
folk, Virginia; Jeffrey Lance Stredler, HOFHEIMER NUSBAUM,
P.C., Norfolk, Virginia, for Appellant. Donald Richard Curry, Senior
Assistant Attorney General, OFFICE OF THE ATTORNEY GEN-
ERAL, Richmond, Virginia, for Appellee. **ON BRIEF:** Linda S.

Laibstain, HOFHEIMER NUSBAUM, P.C., Norfolk, Virginia; Robert Edward Lee, Jr., VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER, Richmond, Virginia, for Appellant. Mark L. Earley, Attorney General of Virginia, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

TRAXLER, Circuit Judge:

Andre L. Graham appeals an order of the district court denying his application for a writ of habeas corpus in which he sought to set aside his conviction and death sentence for the execution-style murder of Sheryl Stack. Graham also shot Stack's companion Edward Martin in the head, but Martin survived and testified against Graham at trial.

The district court granted Graham a certificate of appealability on five of his claims and denied the certificate with respect to the remaining claims.[1] See 28 U.S.C.A. § 2253(c) (West Supp. 1999). We affirm the district court's disposition of the claims for which the certificate was granted; we deny Graham's motion for the certificate on the remaining claims and dismiss the appeal as to them.

_____

[1] The district court granted the certificate with respect to the following claims: (1) that his defaulted claims should be reviewed based on a showing of actual innocence under Schlup v. Delo , 513 U.S. 298 (1995); (2) that the verdict forms supplied to the jury unconstitutionally mandate the imposition of the death penalty; (3) that Virginia's "future dangerousness" aggravating factor is unconstitutionally vague; (4) that trial counsel rendered ineffective assistance in the failure to interview and adequately cross-examine a key witness; and (5) that trial counsel was ineffective in failing to move for a mistrial or a continuance upon discovering potentially exculpatory evidence at trial.

2

I.

The Virginia Supreme Court thoroughly summarized the evidence as follows:

> After finishing their work at the Steak and Ale Restaurant ... in south Richmond on the night of October 7, 1993, Stack drove her Volvo sedan and Martin drove his red sports car to another restaurant in Richmond where they had something to eat. James Jones, the night auditor of a motel adjacent to the Steak and Ale Restaurant parking lot, was standing outside the motel talking to another employee when he saw Stack and Martin return to the parking lot after 2:00 a.m. on October 8. Jones noticed Stack and Martin standing beside one of the two cars talking and kissing until Jones returned to work inside the motel. Twenty to twenty-five minutes later, Jones heard two loud noises,"two or three seconds [apart], maybe up to ten seconds" and saw a third car being driven from the area.

> When Jones looked toward the parking lot, he noticed that the Volvo's engine was running and its lights were on, but that the red sports car was gone. As he walked toward the Volvo, Jones noticed a body lying on the ground and immediately called the police.

> Harold Giles, a Richmond Police officer ... got Jones's call ... and ... found Stack and Martin, both shot in the head, lying face down in a pool of blood, with their hands touching. Giles testified that "they were trying to communicate to each other, but I couldn't make out what they were saying." In addition to observing that the Volvo's engine was running and its lights were on, Giles also noticed that the front passenger door was open....

> When Detective Thomas R. Searles arrived at the scene at "approximately" 6:00 a.m., Stack and Martin had been taken to the hospital.... One photograph of the front seat of Stack's car shows that it had been ransacked, with Stack's personal property and purse in disarray in the front seat. Searles

3

found a .45 caliber cartridge case and two .45 caliber bullets that were approximately one foot apart.

Stack was comatose when she arrived at the hospital and died some time later without regaining consciousness. Although Martin had been shot in the head and suffered extensive brain injuries, he survived and was able to testify. Dr. William Broaddus, a neurosurgeon who treated Martin, testified that the bullet ... damaged the left side of his brain, resulting in Martin's loss of his left eye, a partial paralysis on the right side of his body, and an impairment in his ability to generate language. However, Dr. Broaddus said that Martin's comprehension, memory, and intelligence were perfectly normal....

Martin testified that he and Stack were seated in her car in the parking lot when a man Martin later identified from a photographic spread as Graham approached the car. Graham had a gun and told them to get out of the car. After Stack and Martin got out of the car, Graham told Martin to hand over his wallet and car keys to another man who was with him, but unarmed. As Graham held "the gun on[Stack and Martin]," the other man first got in Stack's car and started it, then got in Martin's car, where ... the other man "saw" Martin's compact disc recordings (CDs). While the other man was in Martin's car, Graham told Stack and Martin that if they would lie down on the parking lot and close their eyes, he would not hurt them. Even though both did as they were directed, they were each shot in the head as they lay on the ground with their eyes closed.[2]

_____

[2] Authorities suspected Mark Sheppard, a friend of Graham's, to be Graham's accomplice. Graham, too, asserts that Sheppard was his accomplice. And, the Commonwealth suggested during summation at the close of the guilt phase of trial that Sheppard was the other assailant. Indeed, the two had a history of violent crime together. Sheppard was convicted of capital murder and sentenced to death for the murders of Richard and Rebecca Rosenbluth. See Sheppard v. Commonwealth, 464 S.E.2d 131 (Va. 1995). Graham also was convicted of capital murder in the Rosenbluth murders, but he received a life sentence. See Graham v. Commonwealth, 464 S.E.2d 128 (Va. 1995). Sheppard, however, was not charged in connection with the murder of Sheryl Stack.

4

Although Martin does not remember how long it was after he closed his eyes that he was shot, Graham was the last person Martin saw with a gun before he closed his eyes. After he was shot, Martin realized that his "car was being started and the car was coming at [him] so[he] quickly rolled over to get out of the way of the car." After they were shot, Stack and Martin were holding hands and he was trying to talk to her.

Priscilla Booker, who had been living with Graham ... since early July 1993, testified that on the morning of Stack's murder, she saw Graham in the same red car as that shown in a police photograph of Martin's car. Later that morning, as Booker was watching the news on a local television station, she mentioned to Graham the reports of the shooting in the Steak and Ale parking lot. Graham's response was, "why do [you] worry about other people."

Graham then asked Booker to stop looking at the news and, when she continued to do so, he became upset. When Booker asked Graham why she should not watch the news, he replied that "he knew who did it[,] but he didn't."

Two or three days after the Stack murder, Booker found Martin's box of over 200 CDs in the trunk of her car. Graham told her that he had bought these CDs for $10, and Booker put them in storage. The police recovered Martin's car a few days after the crimes, but were unable to obtain any useful fingerprint evidence from it.

On the morning of December 3, 1993, Graham, who was incarcerated in the Chesterfield County jail on another charge, made a telephone call to Booker in the presence of Gary McGregor, a Chesterfield County deputy sheriff. Graham told Booker several times during the conversation to "go into the closet, get the bag with the contents and get rid of it." McGregor immediately reported this conversation to his superiors. Shortly thereafter, Detective W.F. Showalter of the Chesterfield County Police Department went to

5

Booker's apartment. There he found a .45 caliber pistol in a plastic bag in a linen closet.

The gun was heavily oiled, and the police were unable to recover any fingerprints from it. However, Booker testified that she had seen the transaction in which Graham had obtained the gun in September 1993, and that since that time, Graham had kept it in his constant possession. Booker testified that Graham even slept with it. After examining the gun, the bullets, and the cartridge case found at the scene, Ann Davis Jones, a firearms identification expert, testified that Graham's gun was the weapon from which the bullets and the cartridge case found at the scene had been fired and ejected.

The police found Martin's CDs in a storage locker rented by Booker's mother. The CDs were examined by Leland W. Kennedy, a fingerprint expert, who testified that 31 of the 48 identifiable fingerprints found on the CDs were those of Graham.

Graham v. Commonwealth, 459 S.E.2d 97, 98-100 (Va. 1995) (alterations in original) (footnote added).

Graham was indicted on eight felony counts arising out of the shootings: one for capital murder of Stack with a deadly weapon during the commission of Martin's robbery; one for attempted robbery of Stack; two for Martin's robbery and malicious wounding; and four for the use and display of a firearm in a threatening manner during the commission of these four felonies. See id. at 97.

Following the guilt phase of trial, the jury convicted Graham of all eight counts, including capital murder. The court then conducted a two-part sentencing phase of trial. The first part, during which the Commonwealth introduced evidence of Graham's prior convictions, was directed to Graham's non-capital convictions. The jury fixed Graham's sentence at life imprisonment for the aggravated malicious wounding, 25 years for the robbery, 10 years for the attempted robbery, and a total of 15 years for three of the firearms convictions.

6

The second part of the sentencing phase of trial was to determine Graham's sentence for the capital murder conviction. The Commonwealth introduced evidence that Graham used the same.45 caliber handgun in committing the capital murder of Rebecca Rosenbluth, who was shot in the head. See Graham, 464 S.E.2d at 128-29. The jury then fixed Graham's punishment at death, finding (1) that Graham was a continuing serious threat to society (the"future dangerousness" predicate), and (2) that Graham's murder of Stack was "vile" in that it involved "depravity of mind" (the"vileness" predicate). See Va. Code Ann. § 19.2-264.4C (Michie Supp. 1999). The jury also imposed another five-year sentence for using or displaying in a threatening manner a firearm while committing the capital murder of Sheryl Stack. After considering a post-sentencing probation report, the trial court imposed the death sentence in accordance with the jury's verdicts.

The Supreme Court of Virginia affirmed Graham's convictions and sentences on direct appeal. See Graham v. Commonwealth, 459 S.E.2d 97 (Va. 1995). Graham then petitioned unsuccessfully for a writ of certiorari in the United States Supreme Court. See Graham v. Virginia, 516 U.S. 997 (1995).

Next, Graham pursued collateral relief in state court. The attorney initially appointed by the Commonwealth to guide Graham through state habeas proceedings withdrew from his representation of Graham on October 19, 1995. A second attorney was appointed to serve as Graham's state habeas counsel; however, he did not learn of his appointment until January 22, 1996, four days before Graham's state habeas petition was due. Subsequently, Graham's counsel was permitted to amend his initial habeas petition, which was filed on July 2, 1996. The amended petition raised three grounds for relief: that Graham's trial counsel rendered ineffective assistance; that the Commonwealth had failed to provide Graham's trial counsel with exculpatory material pursuant to Brady v. Maryland, 373 U.S. 83 (1963); and that Graham was denied a meaningful and rational review of his death sentence on direct appeal.

The Virginia Supreme Court granted the Commonwealth's motion to dismiss in a one-paragraph order, applying the rule in Slayton v. Parrigan, 205 S.E.2d 680 (Va. 1974), to Graham's Brady claim and

7

his rational review claim, and finding "no merit" with respect to Graham's ineffective assistance of counsel claims. Thus, the court ordered that Graham's petition be dismissed. Graham's motion for a rehearing was denied.

In August 1997, having found no relief in state court and having exhausted his remedies there, Graham filed an application for federal habeas relief. See 28 U.S.C.A. § 2254 (West 1994 & Supp. 1999).[3] The district court referred the application to a United States Magistrate Judge, who recommended that Graham's § 2254 application be dismissed. The district court agreed that Graham was not entitled to relief under § 2254, denied his request for an evidentiary hearing, and denied the § 2254 application. Graham then filed this appeal.

II.

Graham first presses a number of arguments directed at the district court's interpretation and application of § 2254, as amended by the AEDPA. Because these arguments apply generally to all of his claims, we consider them together at the outset.

A.

First, Graham contends that the district court erred in interpreting, and then applying, § 2254(d), which precludes federal habeas relief on any claim "adjudicated on the merits in State court proceedings," unless the state court rendered a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." We have explained, as the district court rightly observed, that federal habeas

_____

[3] Graham's state habeas petition was filed after July 1, 1992, the date that Virginia purports to have satisfied the opt-in provisions triggering the default provisions under § 107 of the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, Pub. L. No. 104-132, 110 Stat. 1214. See Bennett v. Angelone, 92 F.3d 1336, 1342 (4th Cir. 1996). Nevertheless, Virginia does not argue that these provisions should apply here.

8

relief under § 2254(d) is allowed "only when the state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable." Green v. French, 143 F.3d 865, 870 (4th Cir. 1998), cert. denied, 119 S. Ct. 844 (1999).

Graham contends that § 2254(d), as interpreted in Green and applied here, contravenes Article III, the Supremacy Clause, and the Suspension Clause of the United States Constitution. None of these claims are novel; we have rejected them all before. See Williams v. Taylor, 163 F.3d 860, 865 n.3 (4th Cir. 1998), petition for cert. granted, 119 S. Ct. 1355 (1999); Green , 143 F.3d at 874-76 (rejecting Article III and Suspension Clause arguments); Mueller v. Angelone, No. 98-31, 1999 WL 387369, at *10-11 (4th Cir. June 14, 1999) (rejecting Supremacy Clause argument). Essentially, Graham asserts that we must abandon the Green standard. Of course, even if we believed Green to be wrongly decided -- which we do not -- we cannot disregard its standard of review because we are bound by prior panel decisions. See Brubaker v. City of Richmond, 943 F.2d 1363, 1381-82 (4th Cir. 1991).

Graham also complains that, in any event, the district court failed to properly apply § 2254(d) as prescribed by Green. We need not worry, however, about the district court's precise analysis so long as our own application of § 2254(d) "confirms that the state courts did not decide any question "`by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable.'" Mueller, 1999 WL 387369, at *11 n.10 (quoting Green, 143 F.3d at 870).

Finally, Graham argues that the state court decision did not satisfy the statutory prerequisites triggering application of § 2254(d). Section 2254(d) applies to claims that were "adjudicated on the merits in State court proceedings." Graham contends that the Virginia Supreme Court's summary dismissal of his state habeas petition was not an adjudication on the merits and, therefore, that the district court was not authorized to apply § 2254(d). We have squarely considered this contention, too, and rejected it. See Thomas v. Taylor, 170 F.3d 466, 475 (4th Cir.) ("[T]he phrase `adjudication on the merits' in section 2254(d) excludes only claims that were not raised in state court, and

9

not claims that were decided in state court, albeit in a summary fashion."), cert. denied, 119 S. Ct. 2361 (1999); Wright v. Angelone, 151 F.3d 151, 156-57 (4th Cir. 1998). Accordingly, we reject Graham's assertion that § 2254(d) does not apply here.

B.

Graham also asserts that the district court erred in applying the AEDPA to his claims because the AEDPA has an impermissible retroactive effect as applied to him. As we recently explained, Lindh v. Murphy, 521 U.S. 320 (1997), does not stand for the proposition that the amendments to § 2254 apply necessarily to any federal habeas application filed after April 24, 1996, the effective date of the AEDPA, as Graham's was. See Mueller, 1999 WL 387369, at *6. Thus, even § 2254 petitions filed after the effective date of the AEDPA could conceivably avoid application of the amended sections of § 2254 if such application would have an improper retrospective effect under Landgraf v. USI Film Prod., 511 U.S. 244 (1994), i.e., if "to do so would attach new legal consequences such that the party affected might have acted differently had he known that his conduct would be subject to the new law." Mueller, 1999 WL 387369, at *8.

Graham's is not such a petition. He argues that had the deferential standards of § 2254(d), as amended by the AEDPA, been in effect during the time he was pursuing relief on direct appeal, his litigation conduct would have been different. The only thing he points to is that under pre-AEDPA law, he had no incentive to raise all of his claims in his petition for a writ of certiorari to the United States Supreme Court because certiorari was routinely denied since de novo federal habeas review was available. This precise argument was presented and rejected in Mueller, and we reject it here. As Mueller observed:

> [W]e find even the suggestion that petitioner might have withheld legitimate claims from his petition for certiorari so that they would be considered by a federal court for the first time on habeas review illogical and thus unpersuasive. Petitioner had no particular incentive pre-AEDPA to reserve his claims -- especially those with any merit -- for habeas review. In fact, just the opposite was true. Even at the time [petitioner] filed his petition for certiorari, the Supreme

10

> Court on direct review had greater authority to correct con-
> stitutional errors than a lower federal court sitting in habeas
> review. Thus, the incentive ... has not changed--then, as
> now, the incentive was to petition the Supreme Court for
> certiorari on all colorable claims.

Id. at *9 (internal citation omitted).

Graham points to no other particular examples that he believes demonstrate a retroactive effect. Consequently, we reject his argument and conclude that the district court properly applied the AEDPA amendments to Graham's § 2254 application.

III.

To be convicted of capital murder under Virginia law, save cases involving murder-for-hire, the defendant must be the actual or immediate perpetrator of the crime. See Strickler v. Commonwealth, 404 S.E.2d 227, 235 (Va. 1991); Cheng v. Commonwealth, 393 S.E.2d 599, 607-608 (Va. 1990). Graham argues that the Commonwealth introduced insufficient evidence to demonstrate beyond a reasonable doubt that he, not his accomplice, was the triggerman in the murder of Sheryl Stack. The district court, applying a de novo standard of review, rejected this claim and concluded that the evidence was clearly sufficient to support the jury's determination that Graham was the triggerman. We agree with the district court's ultimate conclusion that Graham is not entitled to habeas relief on his sufficiency of the evidence claim, and conclude the state court's adjudication of the claim was not an unreasonable application of clearly established federal law. See 28 U.S.C.A. § 2254(d).

The Supreme Court of Virginia thoroughly addressed this issue on direct appeal:

> Graham contends that the evidence is insufficient to prove
> that he was the "triggerman." Since Martin cannot remember
> how long it was after he closed his eyes before he and Stack
> were shot, Graham argues that the Commonwealth had the
> burden of excluding the hypothesis that Graham might have

11

given the gun to the other man, who then shot Stack and Martin.

Nothing in the evidence suggests that Graham may have given the gun to the other man in the interval between the time Martin closed his eyes and he and Stack were shot. Instead, Graham's ownership of the gun, his retention of the gun even when sleeping, Martin's testimony, and Graham's direction to Booker to "get rid of the bag" containing the gun, taken together, amply justify the conclusion that Graham was the person who shot the victims.

Graham, 459 S.E.2d at 100.

In reviewing a sufficiency of the evidence claim,"the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). In view of this standard and the considerable evidence in the record, we cannot conclude that the decision of the Supreme Court of Virginia that the evidence was sufficient to prove that Graham was the triggerman was unreasonable. See 28 U.S.C.A. § 2254(d).

IV.

The district court determined that Graham defaulted a number of his claims. See infra, Part V. Graham raises a "gateway" claim of actual innocence, arguing that two letters he purportedly received from his accomplice following his conviction demonstrate his innocence and allow him to develop various defaulted claims. See Schlup v. Delo, 513 U.S. 298 (1995). Under Schlup , a "claim of innocence is ... not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." Id. at 315 (internal quotation marks omitted). In order to avail himself of Schlup, Graham "must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Id. at 327.

In rejecting this claim, the magistrate judge applied Schlup but concluded that Graham's new evidence failed to satisfy this standard. The district court, however, applied a "clear and convincing" standard, distilled from Sawyer v. Whitley, 505 U.S. 333, 348 (1992), based on its conclusion that Graham's claim is not that he is actually innocent of murder, but that he is not eligible for the death penalty because he was not the triggerman, see id. Graham contends that the district court erroneously applied Sawyer's more stringent evidentiary standard, and that Schlup's "more likely than not" standard is more appropriate for his claim because he contends he is actually innocent of capital murder.

The difference between the two standards hinges on the nature of the habeas applicant's claim: "[T]o the extent a capital petitioner claims he did not kill the victim, the Schlup `more likely than not' standard applies," whereas "[t]o the extent a capital petitioner contests the special circumstances rendering him eligible for the death penalty, the Sawyer `clear and convincing' standard applies, irrespective of whether the special circumstances are elements of the offense of capital murder or, as here, mere sentencing enhancers." Calderon v. Thompson, 118 S. Ct. 1489, 1503 (1998).

We need not dwell, however, on whether Graham is correct because, given the overwhelming evidence of guilt and the lack of anything probative in Graham's "new" evidence, his claim fails regardless of which standard applies. See Calderon, 118 S. Ct. at 1503. Gateway claims of actual innocence, like freestanding ones, are narrow in scope and are reserved for the extraordinary case. See id. at 1502-03; Wilson v. Greene, 155 F.3d 396, 404 (4th Cir.), cert. denied, 119 S. Ct. 536 (1998). Such claims must be founded upon "reliable evidence" that the federal habeas court will evaluate "alongside any other admissible evidence of the defendant's guilt." Wilson, 155 F.3d at 404-05; see O'Dell v. Netherland, 95 F.3d 1214, 1249-50 (4th Cir. 1996), aff'd, 521 U.S. 151 (1997). Viewed alongside the other evidence, the "new" evidence is insufficient to lead us to the conclusion that "it is more likely than not that no reasonable juror would have convicted [Graham] in light of the new evidence." Schlup, 513 U.S. at 327.

It is undisputed that Martin unequivocally identified Graham on several occasions. Martin first identified him as the perpetrator of the

13

crime from a photo lineup. Martin later identified Graham as his assailant during Graham's trial. And, during proceedings relating to Sheppard's capital murder convictions for the Rosenbluth murders, Martin again gave unambiguous testimony that Graham was his assailant and that his focus was on him because Graham had the gun.

Martin testified that Graham was the only one with a weapon on the night of the murder and that Graham's accomplice did not have one. Martin recalled that Graham held the gun on them as they gave his accomplice their wallets and keys and that Graham continued to do so as his accomplice rifled through their cars. Graham was still holding the gun when Martin followed Graham's order to close his eyes.

Graham's girlfriend Priscilla Booker also provided damaging testimony. On the morning of the murder, she saw Graham driving a red car identical to that depicted in a police photograph of Martin's car. According to Booker's testimony, Graham chastised her for watching a news account of Sheryl Stack's murder, and admitted to her that he knew who had committed the murder, although he denied his own participation. Then, shortly after the murder, Booker found Martin's collection of compact discs in the trunk of her car. A fingerprint expert examined the compact discs and testified that 31 of 48 latent fingerprints found on the compact discs belonged to Graham.

Approximately two months after the murder, while Graham was incarcerated on a separate charge, he telephoned Booker and told her to get rid of his handgun. Graham placed this telephone call in the presence of Deputy Gary McGregor who was working at the Chesterfield County jail where Graham was being held. Deputy McGregor testified that Graham indicated he was calling his girlfriend and that, during the conversation, Graham repeatedly instructed her to go to the closet and dispose of the bag and its contents.

Although Booker intended to dispose of Graham's handgun, she failed to do so. Detective Showalter later retrieved it from a closet in Booker's apartment. Booker testified that Graham acquired the weapon in September, prior to the murder of Sheryl Stack, and maintained exclusive possession of it at the time of the murder and afterwards. Booker testified that Graham constantly kept the handgun on

14

his person, tucked inside his pants, and that he even slept with it. In fact, Booker indicated that Graham did not "let it out of his sight" during this time. Graham's handgun, a Llama .45 caliber automatic, was examined by a forensic scientist specializing in firearms identification, who testified that the bullets and casing recovered from the murder scene had been fired from Graham's gun. And, there was no evidence that night that anyone other than Graham obtained possession of the murder weapon or that Graham relinquished control of it even for a short period of time. Additionally, during the penalty phase of Graham's trial, the Commonwealth offered evidence that, less than two months after he murdered Stack, Graham used the same .45 caliber handgun to shoot Rebecca Rosenbluth, for which Graham was convicted of capital murder.

Against this formidable array of evidence, Graham offers the two notes purportedly drafted by Sheppard. Assuming, without deciding, that these handwritten papers would pass as "new evidence" under Schlup, see Royal v. Taylor, No. 99-3, 1999 WL 617885, at *___ (4th Cir. August 16, 1999) (explaining that Schlup defined "new" evidence broadly, requiring that the habeas petitioner offer"`new reliable evidence ... that was not presented at trial'"), they hardly amount to the kind of evidence that casts doubt on Graham's guilt sufficient to support the conclusion that a fundamental miscarriage of justice would occur were we not to review his defaulted claims, see Schlup, 513 U.S. at 316; id. at 324 (instructing that"petitioner [must] support his allegations of constitutional error with new reliable evidence").

Graham's "new" evidence consists of two anonymous handwritten notes. Even accepting Sheppard as the author of the notes, which were unsigned and unsworn and could have been drafted by anyone, we do not believe the notes go very far in establishing Graham's actual innocence claim.[4] First, the content of the notes is, from any

_____

[4] Graham is the only one who suggests these letters were sent by Sheppard. Even a cursory tour of the record demonstrates that Graham's version of his participation in the crimes against Stack and Martin has varied substantially throughout his trial and post-trial proceedings. For example, he maintained to his trial counsel that he was totally innocent and not even at the scene of Stack's murder, and provided a number of alibis which counsel could not confirm. After the jury returned its guilty ver-

15

perspective, vague and ambiguous. Although the notes contain passages that appear to be exculpatory, they likewise contain portions that could readily be viewed as inculpatory.**5** One of the notes castigated Graham for failing to dispose of the murder weapon and for making the phone call to Booker where he advised her to get rid of it. The other berated Graham for implicating the author -- purportedly Sheppard -- in the crime, and goes on to imply that Sheppard did the honorable thing by not providing incriminating evidence against Graham, although he could have. Moreover, Sheppard explained at length in one of the notes that to the extent he provided any incriminating statements against Graham, he did so only because Graham had been tried and convicted in the Rosenbluth murders prior to Sheppard's trial, and that he would have wanted Graham to do likewise had Sheppard been tried first. Thus, the thrust of this note evidences Sheppard's belief that he had manipulated the court system with lies, and would have expected Graham to do the same.

More fundamentally, nothing contained in the notes refutes any of the critical evidence against Graham. Nothing in either note takes the murder weapon out of Graham's hands; if anything, it reinforces that Graham maintained possession and control of it at all times. Graham's "new evidence" likewise fails to contradict Martin's unequivocal testimony that Sheppard did not have a weapon at the murder scene. And, we cannot conceive of how these notes establish a confession by Sheppard, as Graham suggests.**6**

---

dict, Graham admitted to his attorney that he had been there, but took the position that he had not shot anyone. J.A. 703. Graham's lack of veracity is but one of many factors that diminish the utility of this evidence. See Schlup, 513 U.S. at 330 (habeas courts may take credibility into account when determining what reasonable jurors are likely to do).

**5** We note that even the statements that seem to be exculpatory are not susceptible to any definite meaning. For example, the statement that "you're here for some s**t you didn't do" could conceivably refer to either the Stack murder or the Rosenbluth murders. See Graham v. Commonwealth, 464 S.E.2d 128 (Va. 1995). As we have noted, Graham's .45 caliber handgun was involved in both murders and the notes, assuming Sheppard was the author, obviously refer to both cases.

**6** The record also contains an affidavit from Graham's federal habeas counsel recounting an interview he conducted of an individual named

16

Weighing the wealth of incriminating evidence against two ambiguous notes allegedly drafted by a convicted murderer, we are not at all persuaded that it was more likely than not that <u>no</u> reasonable juror would have convicted Graham in view of the new evidence. Accordingly, we reject Graham's actual innocence claim and, therefore, may not review his defaulted claims.

V.

The district court concluded that nine of the claims asserted in Graham's § 2254 application were procedurally defaulted. Graham's procedural defaults, however, may be excused, allowing us to address the merits, only if he can establish cause for and prejudice resulting from the default, <u>see Wainwright v. Sykes</u>, 433 U.S. 72, 90-91 (1977), or that he has suffered a fundamental miscarriage of justice, <u>see Murray v. Carrier</u>, 477 U.S. 478, 495-96 (1986). Graham, however, does not even attempt to argue that the district court erred in determining that the claims were defaulted. Rather, he contends that he has established sufficient cause and prejudice to excuse the default.[7] Reduced to its

_____

Avery Woodson, who purportedly indicated that he knew Graham was not the triggerman. Graham does not rely to any great extent on this evidence, nor should he, since there is no evidence linking this person to the crimes and we do not know the basis of his alleged information.

[7] The district court concluded that the following claims were defaulted: (1) that the Commonwealth failed to turn over exculpatory evidence under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963); (2) that there was insufficient evidence to support sentencing phase findings of depravity of mind on the vileness predicate; (3) that the trial court erred in refusing to charge Graham's proffered instruction under <u>Simmons v. South Carolina</u>, 512 U.S. 154 (1994); (4) that the Virginia death penalty statutes "on their face and as applied are unconstitutional and violate the Sixth, Eighth, and Fourteenth Amendment[s] because jurors are not informed of presumptive life sentences"; (5) that jurors may find "future dangerousness" on the basis of unadjudicated conduct and that there is no standard of proof for such conduct; (6) that the trial court's denial of Graham's motion to prohibit the death penalty denied him effective assistance of counsel; (7) that trial counsel was ineffective in failing to cross-examine Martin's treating physician as to Martin's cognitive abilities or retain an expert to rebut his testimony; (8) that trial counsel rendered ineffective assistance in failing to request an instruction that Graham was not required to testify; and (9) that trial counsel was ineffective in failing to offer proper jury instructions or object to the verdict forms submitted to the jury.

17

essence, Graham's argument is that the Virginia Supreme Court failed to provide his habeas counsel with sufficient notice to investigate and prepare his state habeas petition, resulting, we presume, in the omission of the defaulted claims from his state habeas petition.[8]

Specifically, Graham contends that the manner in which the Virginia Supreme Court appointed his state habeas counsel did not allow counsel sufficient time to prepare a collateral challenge in state court. The attorney initially appointed to represent Graham in his state habeas proceedings withdrew as counsel in October 1995. The Virginia Supreme Court then appointed a second attorney to assist Graham in filing a state habeas petition; however, Graham's new habeas counsel did not learn of his appointment until January 22, 1996, four days before Graham's petition was due.

Graham's attorney immediately moved for an extension of time, informing the Virginia Supreme Court that he had not previously handled a capital habeas case. In addition to the motion, counsel submitted a letter on January 25, again requesting an extension. Out of an abundance of caution, he asked that the letter, which set forth three conclusory claims for relief, serve as Graham's habeas petition if the motion for extra time was denied. The motion for an extension of time to file the petition was denied.

In February 1996, the Commonwealth moved to dismiss. The Supreme Court ordered Graham to respond to the motion to dismiss by April 1, 1996. On April 1, Graham asked for an extension of time in order to file an amended habeas petition. The Virginia Supreme Court granted the motion on May 1, 1996, giving him 60 days to file

_____

[8] We note that the "cause" advanced by Graham could not possibly provide a basis for reviewing Graham's <u>Brady</u> claim. Graham's sole ground supporting his "cause" argument is essentially that the Virginia Supreme Court imposed unreasonable time requirements upon Graham's state <u>habeas</u> counsel, making it impossible for him to adequately investigate and prepare Graham's state habeas challenge. This argument obviously does not pertain to Graham's <u>Brady</u> claim since that claim was raised in his state habeas petition but rejected on procedural grounds by the Virginia Supreme Court pursuant to the rule in <u>Slayton v. Parrigan</u>, 205 S.E.2d 680 (Va. 1974).

18

an amended petition on Graham's behalf, and Graham's amended habeas petition was filed with the Virginia Supreme Court on July 2, 1996.

These events, Graham argues, impeded his state habeas counsel's efforts to investigate and prepare his claims for collateral relief and constitute cause for his defaults. See Murray , 477 U.S. at 488 ("[C]ause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts."). We must reject Graham's claim. Graham was in no way impeded from raising and developing his claims in state habeas proceedings. His habeas counsel learned of his appointment on January 22, 1996, and filed Graham's final state habeas petition on July 2, 1996, more than five months later. Even if it were reasonable for counsel to have done nothing to further develop Graham's claims until May 1, 1996, when the Virginia Supreme Court granted his motion to file an amended habeas petition, he still had two months to prepare Graham's petition. Graham has not attempted to explain why the defaulted claims could not have been investigated and developed in two months' time.

The real nature of Graham's claim, of course, is that his state habeas counsel failed to adequately investigate and prepare his petition for habeas relief. But, a claim that habeas counsel was ineffective is not a cognizable basis for relief. See Quesinberry v. Taylor, 162 F.3d 273, 276 (4th Cir. 1998), cert. denied, 119 S. Ct. 1160 (1999). Accordingly, we conclude that Graham has failed to establish cause to excuse his defaults, and we decline to review these claims.

VI.

Graham presses four ineffective assistance of counsel claims which the district court rejected on the merits. To prevail on a claim for ineffective assistance of counsel, Graham must establish the two familiar requirements of Strickland v. Washington, 466 U.S. 668 (1984). First, Graham must show that his counsel's performance "fell below an objective standard of reasonableness." Id.  at 688. Next, counsel's deficient performance must result in prejudice. See id. at 691-94. In that regard, Graham "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceed-

19

ing would have been different," id. at 694, i.e., the result of the trial was "fundamentally unfair or unreliable" because of the errors, see Lockhart v. Fretwell, 506 U.S. 364, 369 (1993). With these fundamental concepts in mind, we consider each ineffectiveness claim in turn.

A.

First, Graham argues that his trial counsel rendered ineffective assistance by failing to interview Martin, a critical prosecution witness, prior to trial and then, either because of or in addition to trial counsel's failure to conduct a pre-trial interview, failing to effectively cross-examine Martin at trial. Had his counsel questioned Martin prior to trial, Graham asserts, he would have discovered that Martin had been unable to pick Sheppard out of a photo spread as one of his assailants. Using this evidence, argues Graham, counsel could have effectively impeached Martin's credibility as a witness. Moreover, Graham suggests that had Martin's misidentification of Sheppard come to light before trial, it would have revealed that Martin was battling the effects of his severe head wound and provided a "legitimate basis" for requesting the appointment of an expert to evaluate Martin's cognitive abilities and, possibly, refute the testimony of Dr. William Broaddus, who opined that Martin's ability to think and reason was perfectly normal.

To the extent that this claim rests on counsel's failure to interview Martin before trial, the magistrate judge concluded that Graham failed to present the claim during his state habeas proceedings and, therefore, that the claim is defaulted. See Coleman v. Thompson, 501 U.S. 722, 731-32 (1991). The district court, however, concluded that the substance of the claim had indeed been presented to the Virginia Supreme Court in Graham's state habeas petition. The district court then rejected the claim after apparently reviewing it de novo.

We conclude that Graham defaulted this ineffectiveness claim to the extent it is based on counsel's failure to interview Martin prior to trial. Graham's state habeas petition indeed asserts that trial counsel "failed to inquire ... [of] Martin whether he had ever seen a photograph of Sheppard," but this assertion was unquestionably offered in support of Graham's claim that counsel failed to effectively cross-

20

examine Martin. See J.A. at 883. The next sentence in Graham's petition made this clear, explaining that "[c]ounsel's failure to even place the possibility that Martin had been mistaken before the jury, was clearly ineffective." J.A. 883 (emphasis added). Moreover, these assertions appeared under a heading which referenced ineffective cross-examination, not ineffective investigation. Thus, Graham has failed to exhaust a claim based on counsel's failure to interview Martin prior to trial. See Williams, 163 F.3d at 872-73. And, since Graham would be procedurally barred from raising this claim if he returned to the Virginia Supreme Court, the claim is defaulted. See Gray v. Netherland, 518 U.S. 152, 161-62 (1996); Williams, 163 F.3d at 872-73.

With respect to Graham's claim that his attorney conducted a deficient cross-examination of Martin, the district court rejected it after de novo consideration. Although we agree that Graham cannot prevail on this claim, the district court did not apply § 2254(d), as it must do. In applying § 2254(d), we necessarily look to the decision of the state habeas court. Here, the Supreme Court of Virginia, in its one-paragraph order of dismissal, indicated only that it found "no merit" to the ineffective assistance claims. We conclude, after independently reviewing the applicable precedents, see Wright , 151 F.3d at 157, that the decision of the Virginia Supreme Court was not contrary to and did not involve an unreasonable application of the controlling legal principles, see 28 U.S.C.A. § 2254(d).

Trial counsel is afforded a "strong presumption that [his] conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. Counsel's cross examination of Martin was well within the acceptable spectrum of effective assistance. Martin was clearly a very sympathetic witness in light of his severe gunshot wounds, and cross examination of him was fraught with danger. Viewed as a whole, we conclude that the cross-examination of Martin was objectively reasonable. Moreover, even if the cross-examination had been objectively unreasonable under Strickland, Graham has not demonstrated "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. The state habeas court's decision that Graham is not entitled to relief on this claim was reasonable. See 28 U.S.C.A. § 2254(d).

21

B.

Next, Graham contends that trial counsel should have moved for a mistrial or requested a continuance when he learned for the first time, during his cross-examination of lead detective Steve Dalton, that Martin had misidentified Graham's suspected accomplice Sheppard in a pre-trial photo spread. Graham believes Martin's failure to properly identify Sheppard amounts to exculpatory evidence that was not disclosed prior to trial. On this basis, Graham asserts, he was either entitled to a mistrial or a continuance to prepare an attack on Martin's reliability as a witness.

This is really Graham's second try at a Brady claim, albeit indirectly this time. As we explained above, Graham's straight Brady claim was defaulted. See supra Part V. Here, he has simply shifted focus to what he asserts was counsel's deficient response at trial to a potential Brady violation by the Commonwealth. The Commonwealth contends that to the extent Graham asserts that trial counsel rendered ineffective assistance in failing to request a continuance, the claim was not presented to the Virginia Supreme Court because Graham's state habeas petition specifically mentions only counsel's failure to seek a mistrial. The district court rejected this argument, concluding that the claim asserted in Graham's state habeas petition was sufficient to preserve the claim for federal habeas review.

Federal habeas courts may consider a claim only if its substance has been fairly presented to the state courts. See Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir.), cert. denied, 118 S. Ct. 102 (1997). For this to occur, "both the operative facts and the controlling legal principles must be presented to the state court." Id. (internal quotation marks omitted). We conclude that the substance of this claim was presented to the state court. At bottom, Graham's claim is that he received ineffective assistance because counsel failed to act when he discovered a potential Brady violation during trial. In other words, Graham asserts that his attorney did not competently respond when he learned that Martin had failed to identify Graham's accomplice. Therefore, Graham exhausted this claim, permitting us to consider the reasonableness of the Virginia Supreme Court's decision after an independent review of the relevant precedents. See Wright, 151 F.3d at 157.

22

In view of the record, trial counsel's decision not to seek a mistrial or a continuance and, instead, to use the late disclosure of Martin's misidentification to Graham's advantage was certainly a legitimate tactical decision falling "within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. Indeed, the Virginia Supreme Court, in its disposition of Graham's direct appeal, observed that trial counsel "used the fact of Martin's misidentification to his own advantage in his argument to the jury." Graham, 459 S.E.2d at 101. The record bears this out. Trial counsel suggested to the jury that the misidentification of Sheppard cast doubt on Martin's ability to identify Graham as the triggerman. Moreover, Graham's attorney emphasized that this information surfaced only during cross-examination, and that the Commonwealth did not reveal to the jury that Martin was shown a second photo lineup from which he was unable to pick out Graham's accomplice. This line of argument obviously suggested to the jurors that they view the misidentification as particularly damaging to the prosecution on the critical identification issue.

Moreover, even if we were to conclude that counsel's actions were objectively unreasonable under Strickland, we perceive no prejudice (assuming, of course, Martin's misidentification of Sheppard qualifies as exculpatory material under Brady). Graham suggests that, had counsel moved for and obtained a mistrial or a continuance, they could have sought expert assistance to evaluate Martin's cognitive abilities. Graham, however, does not explain why Martin's failure to select Sheppard from a photo lineup provided a better basis for seeking to have Martin evaluated than existed before the misidentification came to light. After all, it was no secret that Martin had suffered a gunshot wound to the head. Moreover, Graham is merely speculating that another expert might have refuted Dr. Broaddus' conclusion that Martin's ability to think and reason was perfectly normal. Because it is based on nothing concrete, this assertion clearly does not demonstrate that there is a reasonable probability that the outcome of the trial would have been different. Alternatively, Graham suggests that had he been granted a continuance or a mistrial, he could have sought to suppress Martin's in-court identification of him based on his misidentification of Sheppard. The unequivocal nature of Martin's identification of Graham, however, has never been in question, and Graham does not question it now. The fact that Martin was unable to identify

23

his accomplice goes to Martin's credibility as a witness and would not have provided a successful basis for suppressing his identification of Graham. Indeed, the trial judge made this clear during the sentencing phase of trial:

> The Court is of the opinion there was no Brady material to give. I watched the young man testify like the jury did. He was very positive in his identification. My recollection of the testimony he said he really didn't see the other man .... His attention was to the man with the gun who happened to be, by the evidence, Mr. Graham. The Court has no problem at all with the case on that point .... In the first place I don't think even on a motion to suppress, it is whether or not his recollection at the time of the offense or whether it is some way the pictures assisted him. ... I watched this young man testify very closely. He was exact. He had difficulty a little bit in speaking but he was convinced beyond all doubt that Mr. Graham shot him.

J.A. 667-68.

We are satisfied that the Virginia Supreme Court, in concluding that this claim was without merit, did not interpret or apply the relevant Supreme Court decisions "in a manner that reasonable jurists would all agree is unreasonable." Green, 143 F.3d at 870. Thus, habeas relief is barred under § 2254(d).

C.

Graham's next ineffectiveness claim is that his trial counsel did not adequately voir dire the potential jurors. Specifically, he contends that counsel failed to ask questions that would enable him to discern whether members of the venire would be able to follow the instructions from the court. Graham also contends that counsel should have explained the elements of capital murder and the meaning and effect of mitigating evidence. Because this information was not included as part of counsel's voir dire, as we understand the argument, counsel had no reasonable way of knowing whether the jurors would automatically impose death if they found him guilty or whether they could

24

give effect to mitigating evidence. The district court concluded that Graham is not entitled to relief on this basis. We agree.

We have previously considered, and rejected, the argument that counsel's conduct of voir dire is not constitutionally sufficient unless he first informs the venire that they may not impose the death penalty unless they find an aggravating factor, and then asks if they could consider a sentence other than death once they returned a guilty verdict and found an aggravating factor. See Yeatts v. Angelone, 166 F.3d 255, 265-66 (4th Cir.), cert. denied, 119 S. Ct. 1517 (1999). Graham's argument is virtually identical and must fail.

Although the questions varied slightly for each member of the venire, we are satisfied that all were asked questions designed to determine if they were predisposed to impose the death penalty if they found Graham guilty of capital murder. The court and Graham's trial counsel posed questions directed to "the relevant circumstance of whether a prospective juror entertains opinions on capital punishment that would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath and [which were] adequate to identify those who would automatically vote for the death penalty." Mackall v. Angelone, 131 F.3d 442, 451 (4th Cir. 1997) (en banc), cert. denied, 118 S. Ct. 907 (1998). Moreover, Graham has failed to establish prejudice, having made no attempt to demonstrate how, "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

In light of the foregoing, the decision of the Virginia Supreme Court is reasonable and, as a result, Graham is not entitled to relief on his claim. See 28 U.S.C.A. § 2254(d).

D.

Next, Graham, who is black, contends that counsel rendered ineffective assistance when he withdrew his motion under Batson v. Kentucky, 476 U.S. 79 (1986). Under Batson , a defendant may establish a prima facie case of discrimination by the prosecutor by showing that: (1) the defendant is a member of a distinct racial group; (2) the prosecutor has used peremptory challenges to remove from the venire

25

members of the defendant's race; and (3) other facts and circumstances surrounding the proceeding raise an inference that the prosecutor discriminated in his or her selection of the jury pool. Id. at 96-97. The Supreme Court has modified Batson to allow defendants of races different from the excused jurors to have standing to raise Batson challenges. See Powers v. Ohio, 499 U.S. 400, 415 (1991). Once the defendant establishes a prima facie case, the burden shifts to the prosecution to advance a non-discriminatory reason for the exercise of the peremptory challenges. See Batson, 476 U.S. at 97. The trial court then determines whether the defendant has proven purposeful discrimination. See id. at 98; Hernandez v. New York, 500 U.S. 352, 358-59 (1991).

The Commonwealth used its five peremptory strikes during jury selection to remove four black jurors and one white juror. Ultimately, the jury (twelve jurors and one alternate) was composed of six black jurors and seven white jurors. Based on the Commonwealth's removal of four black jurors, trial counsel challenged the jury selection under Batson. The Commonwealth indicated that it had removed the black jurors because of their age, not their race. The prosecutor believed these jurors were approximately the same age as Graham, a fact which he felt could engender sympathy for Graham. See Howard v. Moore, 131 F.3d 399, 408 (4th Cir. 1997) (en banc) (explaining that "age is an acceptable race-neutral factor"), cert. denied, 119 S. Ct. 108 (1998). Additionally, he noted that none appeared to be particularly committed to the death penalty. Counsel for Graham argued that these reasons were pretextual, since the Commonwealth removed a black juror who was the same age as one remaining white juror and older than another. The trial judge then required, sua sponte, Graham's attorneys to provide race-neutral reasons for using four of their five strikes to eliminate white jurors. Before the court ruled, however, trial counsel for Graham conferred with the Commonwealth's attorney and then indicated to the court that the issue had been resolved. The court nevertheless entered its finding that the Commonwealth had not based any of its strikes on race. The record shows that counsel then requested a moment to confer with Graham, after which he explained to the trial court that he was withdrawing the Batson motion in exchange for an unspecified concession from the Common-

26

wealth. There is nothing in the trial transcript suggesting that Graham objected to the withdrawal of the <u>Batson</u> motion in any way.**9**

The district court concluded that the claim was meritless after reviewing it <u>de novo</u>. We agree with the district court's ultimate determination that Graham is not entitled to relief on this claim, concluding that the Virginia Supreme Court's decision was not contrary to and did not involve an unreasonable application of the controlling precedents. <u>See</u> 28 U.S.C.A. § 2254(d); <u>Wright</u>, 151 F.3d at 157.

Graham concentrates his argument on the validity of his <u>Batson</u> motion. The mere fact, however, that trial counsel withdrew an arguable <u>Batson</u> motion does not necessarily overcome the presumption that counsel performed competently. Counsel's withdrawal of a valid <u>Batson</u> motion is not objectively unreasonable <u>per se</u>. <u>See Keel v. French</u>, 162 F.3d 263, 272 (4th Cir. 1998), <u>cert. denied</u>, 119 S. Ct. 2353 (1999). Undoubtedly, there are numerous sound tactical reasons not to pursue a <u>Batson</u> motion. Here, even after the Commonwealth exercised its strikes, Graham was left with a jury consisting of six black jurors and seven white jurors. Counsel could have reasonably determined that the composition of the jury was satisfactory and, were they to begin anew following a successful motion under <u>Batson</u>, the resulting jury makeup could have been less to his liking.

Moreover, it is far from certain that Graham had a winning <u>Batson</u> claim in the first place. The Commonwealth articulated a legitimate race-neutral reason for its peremptory strikes. <u>See Howard</u>, 131 F.3d at 408. Counsel's argument that this was merely pretext because the Commonwealth had failed to strike two young, <u>i.e.</u>, similarly situated white jurors is a position that we have rejected. <u>See Matthews</u>, 105 F.3d at 918.

_____

**9** Graham contends that this motion was withdrawn without his consent; however, there is nothing in the record to support this assertion. Graham submitted to the district court his own affidavit declaring that his attorneys failed to consult him or obtain his consent. Because the affidavit was never presented to the state court, we will not consider it. <u>See Wilson v. Moore</u>, 178 F.3d 266, 272-73 (4th Cir. 1999).

27

Because we cannot conclude that the Virginia Supreme Court "appli[ed] the relevant precedent in a manner that reasonable jurists would all agree is unreasonable," Green, 143 F.3d at 870, Graham is not entitled to habeas relief on this claim, see 28 U.S.C.A. § 2254(d).

VII.

Graham next contests, under the Eighth and Fourteenth Amendments, the constitutionality of the verdict forms used by the jury during the sentencing phase of trial. These forms provided four alternative jury verdicts:

> (1) We, the jury, on the issue joined, having found the defendant guilty of capital murder and having unanimously found after consideration of his history and background that there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society, and having unanimously found that his conduct in committing the offense is outrageously or wantonly vile, horrible or inhuman in that it involved [torture] [depravity of mind]; and having considered the evidence in mitigation of the offense, unanimously fix his punishment at death.

> (2) We, the jury, on the issue joined, having found the defendant guilty of capital murder and having unanimously found after consideration of his history and background that there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society, and having considered the evidence in mitigation of the offense, unanimously fix his punishment at death.

> (3) We, the jury, on the issue joined, having found the defendant guilty of capital murder and having unanimously found that his conduct in committing the offense is outrageously or wantonly vile, horrible or inhuman in that it involved [torture] [depravity of mind]; and having considered the evidence in mitigation of the offense, unanimously fix his punishment at death.

28

(4) We, the jury, on the issue joined, having found the defendant guilty of capital murder and having considered all of the evidence of aggravation and mitigation of such offense, fix his punishment at imprisonment for life.

J.A. 1230. The foreman was required to sign the verdict selected by the jury and the jury was instructed "to cross out any paragraph, word or phrase which you do not find beyond a reasonable doubt." J.A. 586.

According to Graham, the alternative verdict forms misled the jury into thinking that a death sentence was mandatory if they found one of the aggravating factors because the jury was not explicitly given the option of imposing a life sentence even if one or both of the aggravating factors was present. Graham advances this position despite the fact that the verdict forms provided to the jury incorporated statutorily-required language virtually verbatim, see Va. Code Ann. § 19.2-264.4D (Michie Supp. 1999), and despite the fact that the trial judge specifically instructed the jury that "you are not compelled to impose the death penalty even if you find one or both of these [aggravating factors] proven beyond a reasonable doubt," J.A. 585.

The Commonwealth contends that Graham defaulted this claim, having failed to present it to any Virginia Court. On direct appeal, Graham contended that the "jury verdict forms inhibit[ ] the jury from giving independent weight to aspects of the defendant's character and record and to circumstances of the offense that are proffered in mitigation," a claim which the Virginia Supreme Court rejected. Graham, 459 S.E.2d at 100. The magistrate judge concluded that Graham's federal habeas claim -- that the verdict forms mandate a sentence of death once an aggravating factor is found -- is substantially different than the issue presented on direct appeal. The district court, however, concluded that Graham raised the essence of his federal claim on direct appeal.

We think that the substance of the claim was fairly presented to the Virginia Supreme Court. See Matthews, 105 F.3d at 911. Graham's argument here is that the alternative verdicts fostered the misconception that a death sentence is automatic when an aggravating factor is present, i.e., because of the forms, the jury did not understand it retained the option to impose a life sentence, even after finding one or more aggravating circumstances. In our view, this is essentially the

29

same as arguing that the verdict forms "inhibited" the jury from according proper weight to evidence offered in mitigation.

Nevertheless, Graham is not entitled to relief. We have previously visited, and rejected, the suggestion that sentencing instructions -- which incorporated the same statutory language and virtually identical verdict forms -- "failed to inform the jury adequately of its option to recommend life imprisonment." Briley v. Bass , 750 F.2d 1238, 1242-43 (4th Cir. 1984). And, to the extent that Graham suggests the verdict forms used in his sentencing proceeding failed to adequately address the concept of mitigation, his claim is patently without merit. See Buchanan v. Angelone, 118 S. Ct. 757, 758-59 (1998); Eaton v. Angelone, 139 F.3d 990, 993 (4th Cir.), cert. denied, 118 S. Ct. 2338 (1998). Because the Virginia Supreme Court's rejection of this claim was reasonable, Graham is not entitled to relief under § 2254(d).

VIII.

Next, Graham contends that Virginia's future dangerousness aggravating factor is unconstitutionally vague on its face because the definition of "future dangerousness" is too broad to sufficiently guide jurors in exercising their discretion. And, he argues, because the trial judge did nothing more than paraphrase the statute in his instructions to the jury, the statute was unconstitutionally applied to Graham.

Graham raised this constitutional challenge to the future dangerousness factor on direct appeal to the Virginia Supreme Court, which rejected it. See Graham, 459 S.E.2d at 100. The district court determined that the claim was meritless based on circuit precedent. See, e.g., Spencer v. Murray, 5 F.3d 758, 764-65 (4th Cir. 1993).

Initially, we note that Graham would not be entitled to relief on this claim even if the Virginia Supreme Court had unreasonably determined that the "future dangerousness" factor was not unconstitutionally vague. Graham's sentence was also predicated on the vileness factor, which Graham does not -- and cannot -- suggest is unconstitutional. See Bennett v. Angelone, 92 F.3d 1336, 1345 (4th Cir. 1996) (rejecting vagueness challenge to the vileness predicate). Thus, Graham's sentence rested on a constitutional predicate-- vileness -- even if the future dangerousness factor was constitutionally infirm. See George v. Angelone, 100 F.3d 353, 362-63 (4th Cir. 1996). More-

30

over, the Virginia Supreme Court reviewed Graham's sentence and determined that the jury's findings of future dangerousness and vileness were fully supported by the evidence, and that the sentence was not arbitrary, excessive, or disproportionate. See Graham, 459 S.E.2d at 101-102. Therefore, even if Graham were to succeed on this claim, he would still not be entitled to habeas relief because the sentence still rests on the vileness predicate, which is sound. See id. at 363.

In any event, under § 2254(d) we cannot disturb the Virginia Supreme Court's decision. It is a well-rooted principle that Virginia's statutory future dangerousness factor is constitutional. See Eaton, 139 F.3d at 998; Spencer, 5 F.3d at 764-65. Accordingly, the jury instructions here, which paraphrase the statutory text, pass inspection under the Constitution. Graham is entitled to no relief on this claim.

IX.

Graham also contends that the district court erred in concluding that he was not entitled to an evidentiary hearing. Specifically, Graham seeks to have his habeas application remanded to the district court for him to develop further the factual basis for his ineffective assistance and actual innocence claims. We cannot agree that he is entitled to an evidentiary hearing. Even if Graham could demonstrate that he is not precluded by the AEDPA from obtaining an evidentiary hearing on these claims, see 28 U.S.C.A.§ 2254(e) (West Supp. 1998),[10] we are confident that he is nevertheless not entitled to an evidentiary hearing, see Cardwell v. Greene, 152 F.3d 331, 338 (4th Cir.) (explaining that petitioner is not necessarily entitled to a hearing even if § 2254(e)(2) does not bar one), cert. denied, 119 S. Ct. 587 (1998).

With respect to his ineffective assistance claims, Graham has failed to "allege[ ] additional facts that, if true, would entitle him to relief." Cardwell, 152 F.3d at 338 (internal quotation marks omitted). Graham has not pointed to any facts in addition to those contained in the

_____

[10] Under the AEDPA, a habeas applicant who "has failed to develop the factual basis of a claim in State court proceedings" is precluded from an evidentiary hearing unless the applicant demonstrates that the claim's "factual predicate ... could not have been previously discovered through the exercise of due diligence." 28 U.S.C.A. § 2254(e)(2).

31

record that he expects would come to light in an evidentiary hearing; in fact, he has not even explained in the most general terms how an evidentiary hearing in the district court would aid his ineffective assistance claims. See id. As we have observed on several occasions, "`[e]videntiary hearings have never been required on federal collateral review of state petitioners' ineffectiveness claims.'" Fitzgerald v. Greene, 150 F.3d 357, 369 (4th Cir.) (quoting Eaton, 139 F.3d at 994) (alteration in original), cert. denied, 119 S. Ct. 389 (1998). Graham has given us no reason to conclude that one was required here. Indeed, Graham did not even request that the district court order discovery. Moreover, the district court permitted Graham to expand the record to include all of the evidence he offered in support of his federal habeas application, his opposition to the Commonwealth's motion to dismiss, and his objections to the recommendation of the magistrate judge. We conclude that no evidentiary hearing was required for his ineffective assistance claims.

Likewise, with respect to his actual innocence claim, Graham has failed to forecast what additional evidence, if any, would be added to the two letters purportedly drafted by Sheppard. These two letters form the basis of his actual innocence claim. Graham has not even attempted to explain how an evidentiary hearing in the district court would further develop the basis for the claim, particularly in light of the expanded record. We perceive no error here.

X.

For the foregoing reasons, we affirm the denial of Graham's application for a writ of habeas corpus under 28 U.S.C.A.§ 2254 with respect to the claims for which a certificate of appealability was granted. With respect to the remaining claims, we conclude that Graham has failed to make "a substantial showing of the denial of a constitutional right." 28 U.S.C.A. § 2253(c)(2). We therefore deny Graham's motion for the certificate on the remaining claims and dismiss the appeal as to them.

AFFIRMED IN PART AND DISMISSED IN PART

32